JOSEPH KENTON v. MICHAELA LEONARDA, BARONESS OF
PONTALBA.

The transfer by the King of Spain of the sovereignty of Louisiana to the French
Republic, was not complete by the treaty of San Ildefonso, of the 1st of October,
1800, nor by that of Madrid, of the 21st of March, 1801. Spain continued to be
the sovereign *de facto;* and the terms of these treaties do not necessarily import a
change of sovereignty *de jure*, but only convey the idea of a promise to cede on
the performance of certain conditions precedent. The first authentic evidence of any
admission by the King of Spain that the conditions had been performed by the
French Republic, or of any act towards the execution of the promise stipulated in
those treaties, is in the *Cédula* or Royal Order of the 15th of October, 1802, the
terms of which are inconsistent with the idea that the sovereignty of Louisiana had
already vested in the French Republic.

The Royal Order of the King of Spain for the retrocession of the territory of Louis-
iana to the French Republic, was dated the 15th of October, 1802; the appointment
of Commissioners to deliver possession. was made on the 18th of May, 1803; and the
final surrender of the colony, was made on the 30th of November following.

On the transfer of the sovereignty of a country, the inhabitants are protected in the
possession of their private property. Such is the law of nations, even in cases of
conquest.

THIS action was instituted before the District Court of the First
District, *Buchanan*, J. The plaintiff claims to be the owner of
a tract of land, between the inhabited part of the city of New Or-
leans and the bayou St. John, having two *arpens* front on the south
west side of the canal Carondelet, near the first half-moon, and
extending between parallel lines to Common street, on which it
also fronts, one of the side lines being seventeen *arpens*, two *toises*,
and two feet in length, and the other seventeen *arpens*, and five
*toises*.

*Preston*, for the plaintiff.

*Janin*, for the defendant. The grant under which the plaintiff
claims is void, for it was made on the 20th of May, 1801, and by
the fourteenth section of the act of Congress of the 26th of March,
1804, (1 Land laws, 503,) it is enacted 'that all grants for lands
within the territories ceded by the French Republic to the United
States, by the treaty of the 30th of April, 1803, the title whereof
was, at the date of the treaty of San Ildefonso (1st October, 1800),
in the crown, government, or nation of Spain, and every act and

proceeding subsequent thereto, of whatsoever nature, towards the obtaining any grant, title, or claim, to such lands, and under whatsoever authority transacted or pretended, be and the same are hereby declared to be, and to have been from the beginning, null, void, and of no effect in law or equity.'

An exception is made by a proviso in favor of persons who have ' *actually settled*' on the lands so granted to them, before the 20th of December, 1803.

This law, which has never been repealed, must decide the question. The plaintiff's claim has never been confirmed by the United States, and he is not within the above exception. For the tract granted is a low swamp, it never was, and indeed, in its present condition, is not susceptible of settlement.

' Settlement,' in the meaning of the acts of Congress, requires cultivation and permanent occupancy. *Hickie* v. *Starke*, 1 Peters, 94. 2 Land laws, 465.

Congress, in its subsequent acts, persevered in the same policy. By the first section of the act of March 2d, 1805, providing for the settlement of spanish and french land titles in Louisiana, grants made subsequently to the 1st of October, 1800, are again excepted from the measures prescribed for other claims, 1 Land laws, 518, and the proviso of the fifth section of the same act says, (p. 521,) ' that nothing in this act shall be construed so as to recognize any grant or incomplete title, bearing date subsequently to the 1st of October, 1800, or to authorize the commissioners aforesaid to make any decision thereon.'

By the fifth section of the act of the 21st of April, 1806, 1 Land laws, 534, the land commissioners were directed ' to enquire into the nature and extent of the claims which may arise from a right or supposed right, to a double or additional concession on the back of the grants or concessions heretofore made, or from grants and concessions heretofore made to minors, and not embraced by the provisions of this act, or *from grants or concessions made by the spanish government subsequent to the 1st of April*, 1800, *for lands which were actually settled and inhabited on the 20th of December*, 1803, *and to make a special report thereon to the Secretary of the Treasury, which report shall be by him laid before Congress at their next ensuing session.*'

Mr. Gallatin's instructions, which were approved by the President, 1 Land laws, 986, direct that all grants posterior to the 1st of October, 1800, must be rejected, unless they are embraced by the second section of the act of March 2d, 1805, (Ib., 518,) that is, unless they were both ' *cultivated* and *inhabited*' before the 20th of December, 1803.

The preceding are the only provisions of the laws of Congress relating to those claims. They deprive the plaintiff of all right ; conscious that he was not within the exception, he did not even make an effort to have his claims confirmed. What can the plaintiff oppose to these positive enactments? He is without an answer, unless they be unconstitutional or contrary to the treaty of cession. But such an assertion is easily met.

Congress has always treated grants posterior to the 1st of October, 1800, as nullities, because from that date, which is that of the treaty of San Ildefonso, Louisiana ceased to belong to Spain, or at least, Spain was deprived of the right of disposing of any part of the domain. The treaty of San Ildefonso is not to be found in the books which are usually consulted, but the only part material in this controversy is recited in the treaty of cession of Louisiana to the United States, art. 1. 1 Land laws, 42. ' Whereas by the third article of the treaty of San Ildefonso, the 9th Vendémiaire, an 9, (1st. October, 1800,) between the First Consul of the French Republic and his Catholic Majesty, it was agreed as follows : His Catholic Majesty promises and engages on his part to retrocede to the French Republic, six months after the full and entire execution of the conditions and stipulations herein to his Royal Highness the Duke of Parma, the colony or province of Louisiana, with the same extent,' &c.

It is useless to enquire what those conditions were, and when they were complied with. It is well known that from the date of the treaty, both parties considered Louisiana as belonging to France; that Spain was satisfied with the manner in which France acquitted herself towards the Duke of Parma, and never threw any obstacles in the way of the delivery of Louisiana, which was delayed only on account of causes foreign to the treaty. If Louisiana had not been ceded *instanter* by the treaty, the treaty would at least be correctly assimilated to a promise of sale coupled with a suspensive

condition, the accomplishment of which lies with the vendee.  On
the accomplishment of the condition he would become the absolute
proprietor, and be entitled to the possession of the property, without
diminution, and any partial sales subsequent to the promise of sale
in question would be null as to him.  As France stipulated to give
a fixed and well ascertained equivalent for Louisiana as it was on
the 1st of October, 1800, she was entitled, on complying with her
engagement, to the undiminished ownership of what she had agreed
to buy on that day.  If Spain did not prevent subsequent conces-
sions by her officers, the fault was hers, and France cannot suffer
therefor.  In a question between two governments affecting the
interests of their subjects, the subjects of neither can be consider-
ed as third persons.

The United States acted with becoming liberality by confirming
these subsequent claims, which were immediately converted by the
grantees to their legitimate purpose by actual settlement.  No mo-
tive of policy, no principle of justice required the confirmation of
grants not settled on.

This question is not a new one.  It underwent a full and elabo-
rate discussion in the case of *Foster and Elam* v. *Nielson*, 2 Peters,
288, and that decision was followed in the cases of *Garcia* v. *Hatch*,
8 Martin, N. S., 398, and *Garcia* v. *Lee*, 12 Peters, 511.  In these
three cases lands were claimed lying between the thirty first degree
of latitude, the Iberville river, the Mississippi, and the Perdido.
After the cession of Louisiana, Spain still retained the possession
of this portion of country until 1810, claiming it as a part of West
Florida.  The United States, on the contrary, claimed it as a part
of Louisiana.  The questions decided by the courts were : 1. That
the district of country in question was a part of Louisiana, and
passed as such to the United States by the treaty of cession of 1803.
2. That the grants sued on were null and void, because they were
posterior to the treaty of San Ildefonso of the 30th of October,
1800.  It is unnecessary to do more than to refer to the reasoning
of Chief Justice Marshall in the case of *Foster and Elam* v. *Niel-
son*. 2 Peters, 288.  The latter point, in the opinion of the Supreme
Court, was alone sufficient to decide the case against the plaintiff,
and has alone a bearing upon the present case.  It may be ob-
served that the grants in those cases were posterior to the 20th of

Kenton *v.* The Baroness of Pontalba.

December, 1803, but in the case of *Foster and Elam* v. *Nielson,* the order of survey was anterior to that date, and consequently that case is in every respect analogous to the present.

But Congress never made any difference between *unsettled* grants posterior to the 1st of October, 1800, whatever might be their precise date. The same laws and the same reasoning are applicable to all these cases. It that decision, it will also be noticed that the court is of opinion ' that the judiciary is not the department of the government, to which the assertion of its interests against foreign powers is confided ; and that its duty commonly is to decide upon individual rights according to those principles which the political departments of the nation have established. If the course of the nation has been a plain one, its courts would hesitate to pronounce it erroneous.' 2 Peters, 307. The applicability of these views to the present case is obvious. The United States have uniformly maintained that Spain had no right to grant lands in Louisiana after the treaty of San Ildefonso ; and our courts would not, without strong reasons, declare the contrary. See particularly pp. 315 and 316, which contain a recapitulation of the acts of Congress. On p. 304, Chief Justice Marshall says, ' the act of March 26th, 1804, sec. 14, (which annuls all grants posterior to 30th October, 1800,) *was obviously intended to act on all grants made by Spain after her retrocession of Louisiana to France, and withovt deciding on the extent of that retrocession, to put the titles which might be thus acquired through the whole territory, whatever might be its extent, completely under the control of the American government.'*

It follows, that without a positive confirmation by Congress, such claims have no value whatever.

The cases of *Harcourt* v. *Guillard,* 12 Wheaton, 528, *Henderson* v. *Poindexter's Lessee,* Ib., 500, and *Poole* v. *Fleeger,* 11 Peters, 207, present instances of grants made by the wrongful, though *bona fide* possessors of the country, and annulled for reasons similar to those presented by this case.

BULLARD, J. The defendant, by her agent, having advertised for sale at auction certain lots of ground in the rear of the city of New Orleans, the plaintiff obtained from the District Court of the first judicial district an injunction restraining her proceedings, on alleging title to said lots, and denying the right of the defendant to

the same, and praying to be quieted in his title against her preten-
sions. The defendant, by her answer, denies the right of the
plaintiff, asserts title in herself to the *locus in quo* in dispute, and
further pleads prescription of ten, twenty, and thirty years. Judg-
ment having been rendered in favor of the plaintiff in the court
below, the defendant prosecutes the present appeal.

The plaintiff exhibits as evidence of title, a patent in due form,
granted by the Intendant of Louisiana, Don Ramon de Lopez y
Angulo, and bearing date the 20th of May, 1801, (and which ap-
pears to have been duly registered in the land office of the United
States,) in favor of Carlos Guardiola, together with a regular chain
of conveyances from the original grantee down to himself.

The argument in this court has turned mainly upon the alleged
nullity of this grant. It has been strenuously urged that it is void,
because after the 1st of October, 1800, the date of the treaty of San
Ildefonso, Spain was no longer the sovereign of Louisiana; that it
belonged *de jure* to the French Republic, and that the Governor,
Intendants, or Sub-delegates, acting under the pretended authority
of Spain, had no longer a right to make any grants of land. It is
further contended that even supposing the authority of the Inten-
dant unimpaired, the grant is nevertheless void, because the same
land had been previously conceded by the government of France
as early as 1752 and 1764; and that.the certificate of Trudeau, the
Surveyor General, that the land was vacant previously to Guar-
diola's grant, was manifestly erroneous.

It is therefore under this two-fold aspect, that we are to examine
the pretensions of the parties. If Guardiola's concession be void,
either on the ground of a change of sovereignty previous to its date,
or because the land no longer belonged to the domain, then the
plaintiff must fail.

I. It is probable that some misconceptions have existed in relation
to the celebrated treaty of San Ildefonso. It would seem from the
words of an act of Congress, relied on in argument, that the legis-
lative department of the government of the United States had re-
garded the change of sovereignty as complete at the date of that
treaty, to wit, October 1, 1800; and that France became from that
moment the true sovereign of the province of Louisiana. A recur-
rence to the treaty itself, and to the history of the day, will show

clearly that such was not the intention of the contracting parties. It was stipulated by the treaty that the Duke of Parma should be elevated to the rank of king, under the auspices of the French Republic, with an extension of territory and an augmented number of subjects, and that his regal dignity should be recognized by the other crowned heads. By the third article, his Catholic Majesty promises and engages, six months after the full and complete execution of the conditions and stipulations relative to the Duke of Parma, to retrocede to the French Republic the province of Louisiana, with the same extent, &c. ' The treaty of Madrid of the 21st of March, 1801,' says the historian, ' renews these engagements, and the first article contains the detail of the conditions upon which the cession was made. It was specially stipulated that the reigning Duke of Parma, as an indemnity for that Dutchy, and its dependencies, and also in consideration of the cession which the King of Spain made of Louisiana, should be put in possession of Tuscany under the name of the Kingdom of Etruria.' These stipulations which could not be executed at that time, became afterwards the subject of many complaints on the part of Spain, and Louisiana remained yet for some time under its domination. Barbé Marbois. Hist. de la Louisiane, p. 185.

This last treaty spoken of by the historian has been little known, and, as well as that of the year 1800, does not appear to have been promulgated *in extenso* at that period, nor for many years afterwards. It is a matter of historical notoriety, that the spanish governors continued in the meantime to exercise all their authority, as if no such compact had been entered into, and that Spain continued *de facto* the sovereign of Louisiana. The terms of the treaty do not import necessarily a change of sovereignty *de jure*, but convey only the idea of a promise to cede the territory in full sovereignty, upon the performance of certain conditions precedent. The first authentic evidence, with which we are acquainted, of any admission on the part of the king of Spain, that such conditions had been performed by France, or of any act done towards the execution of the promise stipulated by the treaty of San Ildefonso, is contained in the *Cédula* or Royal Order of the 15th of October, 1802. The terms of this *Cédula* are inconsistent with the idea, that the sovereignty was already, by the compact of 1800, vested in the French Republic. It

recites, that whereas the King had thought proper to retrocede to France the territory and colony of Louisiana, the Intendant is ordered to put General Victor, or any other officer duly authorized by the French Republic, in possession of the colony, &c., 'in order that *henceforth the same may belong to said Republic,* and that she may cause it to be administered and governed by her own officers and governors, as her own possession, without any exception whatever.' The King proceeds to order an inventory ' to be made of all the effects belonging to the crown, with an appraisement, in order that their value may be reimbursed by the FrenchRepublic,and concludes by expressing his hope and confident expectation, that the inhabitants may continue and be protected in the peaceful possession of their property, and that all grants or property of whatever denomination, made by his governors, may be confirmed, although not confirmed by himself.' Will it be said, that this is but the expression of a hope or wish on the part of the King of Spain ? It may be answered, that such, in reference to private property, is the law of nations, even in cases of conquest, and that France, by its subsequent treaty with the United States, responded to this appeal, and stipulated for the integrity of private property up to the date of the treaty of cession of 1803.

The subsequent acts of the Commissioners appointed on the part of Spain to deliver possession, confirm this view of the case. Governor Salcedo and the Marquis of Casa Calvo, who had been appointed for that purpose, in a public document dated the 18th of May, 1803, repeat the terms of the *Cédula,* under which they acted, and which have already been noticed; and the final surrender of the colony took place a few months afterwards, to wit, on the 30th of November, 1803. In the act of delivery, or protocol of the Commissioners on both sides, they declare that the French Commissioner is put in possession of the colony of Louisiana and its dependencies, &c., 'in order that the same may henceforth belong to the french republic, and be governed and administered by its officers and governors, in such manner as will best suit its interests ; and that they have accordingly solemnly delivered to him the keys of the place, declaring that they absolve from the oath of fidelity to his said Majesty all such inhabitants as may choose to continue in the service or dependence of the French Republic.' Whether the change

of sovereignty took place at the date of the Royal Order of the 15th of October, 1802, or at the time when the inhabitants were absolved from their oath of allegiance, more than a year afterwards, is immaterial for the purpose of this argument. It is enough that the cession was not complete by the treaty of San Ildefonso, nor by that of Madrid of 1801.

If the validity of Guardiola's grant depended alone on the treaties of which we have been speaking, we should not hesitate to say that having been completed before the change of sovereignty, the land had become private property, and is to be protected under the treaty of cession to the United States.

But it is further urged that the grant in question is declared null and void by the 14th section of the act of Congress of the 26th March, 1804, entitled ' an act erecting Louisiana into two territories, &c.,' which declared that all spanish grants, subsequent to the date of the treaty of San Ildefonso, and all proceedings towards obtaining such grants, shall be held to be null and void. Without stopping to enquire into the authority of Congress to annul a grant reposing on the faith of treaties between other sovereign states, and one of them its own immediate predecessor, or how far the adjudicated cases referred to in argument would apply to a case within the acknowledged limits of ancient Louisiana, in the island of Orleans itself, we will content ourselves with remarking that, in our opinion, the grant in question is protected by the proviso to the section relied on, which saves all grants to actual settlers. It is shown that the land conceded to Guardiola, was inhabited and improved.

II. We come now to the second ground of defence, and to enquire how far the evidence in the record shows that the *locus in quo* had been granted by the french government before the cession of Louisiana to Spain. No such written concession is exhibited; but it is contended that the evidence sufficiently shows, that the surveyor general, Trudeau, was mistaken, when he certified that the land was vacant at the time Guardiola's patent was issued. If granted at all during the existence of the french authority, it must have been either to Le Breton in 1752, or to Latil in 1764. Let us examine each in succession.

*First.* The extent of Le Breton's grant is quite uncertain. Our knowledge of it is derived principally from his own declarations in

some of the documents in the record. We find him in 1757 selling to MadameD'Auberville six *arpens,* fourteen *toises* and four feet front on the bayou road, with the same depth, as a tract which the husband of the purchaser had acquired from Tourangeau, and adjoining it. The vendor reserves two *arpens* front, by the *depth which it has,* and adjoining on the other side land of the heirs of Morant. Supposing the front of Le Breton's land to have been eight *arpens,* fourteen *toises,* and four feet, and it being verv clear, that the side lines were parallel, and in a direction east and west, it is obvious that it could not cover the land in controversy. But we are satisfied that in point of fact the two *arpens* reserved, and which were afterwards given to Docminil Morant, did not adjoin the land of the heirs of Morant, but that there was a space of vacant land between the two tracts, which was subsequently granted to Latil, and which we shall have occasion to examine afterwards.

Le Breton, in 1758, made a donation to Docminil Morant of the two *arpens* reserved by him in his sale to Madame D'Auberville, and in the act of donation he described the land as having two *arpens* front, *avec la profondeur qui se trouvera,* adjoining on one side lands of the heirs of Morant, and on the other lands which Latil had purchased from Madame D'Auberville. The depth is left doubtful; but whatever it may be, the side lines must be taken as parallel to each other, and extending from east to west from the bayou road. The two *arpens* would not then cover the land in dispute. The expression, *avec la profondeur qui se trouvera,* implies less than forty *arpens.* The existence of this grant of Le Breton, and especially its original extent, is left very doubtful. Even the original survey has not been produced, nor accounted for. The whole rests principally upon Le Breton's own declarations, and it is not until his ratification of the donation to Docminil Morant, that he speaks of the depth of the two *arpens,* extending to Pradelles' land. In order to destroy the validity of a regular title, in form like that of Guardiola's, it does not suffice to render it probable that the land had been previously granted. Something more definite is required for judicial purposes. After the most attentive consideration we have been able to give to this part of the case, we conclude that Le Breton's pretensions to the land covered by the plaintiff's title, may be laid out of view.

*Second.* This brings us to consider Latil's grant. Here we have something more certain and definite. We have the grant, and a public survey, and the only question is as to the extent of the land conceded, and whether it crossed the canal Carondelet so as to cover the land granted to Guardiola.

Latil had purchased, it appears, the land of D'Auberville, already spoken of, and Madame D'Auberville had acquired of Le Breton, whatever may have been the original depth of his grant, only four *arpens* and twenty *toises* in depth west from the bayou road. On the other side there was the rear of the land of the heirs of Morant, of about the same front, and between these two tracts it was discovered that there was a vacant piece of land. This was granted in 1764 to Latil. A copy of the concession is before us, and is in substance as follows: "Upon the petition which Mr. Latil has made to grant him a *piece of vacant land* and not conceded, situated *between the minors Morant* and *the land which he declares to have purchased from the succession of D'Auberville*, all situated in this city, fronting on the bayou road, which leads to St. John. We by virtue of the power given to us by the King, and upon the petition and the certificate of the surveyor, Amelot, have conceded and do concede to him the said piece of land, *such as it may be found.*"

It could not be inferred from the expressions of this grant that the government intended to concede a small front upon the bayou road with a depth of forty *arpens*, or indeed any depth beyond the extent of the side lines, to wit: the back line of the land of the heirs of Morant, and the side line of the tract purchased by Latil of D'Auberville's succession. The piece of land was granted *such as it was*, between two given boundaries. If the back line was left uncertain, or rather was not given, it is not difficult to ascertain what it was. If we go beyond the back corner of Morant's tract in the direction of the back line, and beyond the back corner of the D'Auberville tract to an indefinite extent, and close the lines, we evidently enclose land not between the two given boundaries. It is more reasonable in itself, and more consonant to the terms used in the grant, to suppose that the back line of the grant was intended to run from the back corner of the Morant tract to that of Latil's purchase from D'Auberville. This mode of laying

it off would give a trapezium, as the piece of land is called in some of the authentic documents in the record. The survey made by Devezin does not give any definite depth, and is not inconsistent with the view now expressed.

The extent of Latil's land in the rear appears always to have been a subject of doubt. Trudeau, the surveyor general, in his notes in explanation of his plan of the city of New Orleans, and its environs, upon the faith of which the grants of Suares, Vidal, and Guardiola appear to have been made, says, 'these lands of D'Auberville passed afterwards into the hands of Mr. Alexander Latil, who on the 6th of August, 1764, obtained the grant of a remnant of land, (un reste de terre,)' between that acquired from D'Auberville and that of Mr. De Morant. This concession speaks neither of front nor of depth, but only of a remnant of vacant land. Mr. Latil was then proprietor of four arpens and twenty toises sold by Tourangeaud, eight arpens and fourteen toises and four feet sold by Le Breton, and one arpent and twelve toises, the remnant of land granted to him, in all thirteen arpens, sixteen toises and four feet front on the bayou road. By means of a change in the direction of the lines, Latil sold eighteen arpens front on the bayou road. These eighteen arpens were measured and bounded, (I presume by Mr. Olivier Devezin,) each proprietor enjoying quietly, each his respective share, but all the possessors in good faith believed themselves entitled to the land in the rear. As there remains too much doubt as to the depth of these lands, it appears to us justice would be done to all by extending them to within sixty feet of the canal Carondelet.

This act of the surveyor general giving to the vague pretensions of the various grantees in the rear, a more definite location, has been ingeniously criticised at the bar; but so far as it relates to Latil's grant it appears to have been sufficiently liberal, and so far as we are informed, acquiesced in by all parties concerned. We cannot perceive how the grant of Latil could be laid off in comformity to its terms, so as to cross the canal Carondelet, and interfere with the grant in favor of Guardiola.

Whether therefore, we consider the defendant as holding under Le Breton, or under Latil, neither title will, in our opinion, avail her. The side lines of Le Breton's grant, whatever may have been

its original depth, evidently ran east and west from the bayou road, and consequently could not embrace the *locus in quo;* and there is nothing in the record to satisfy us that Latil's grant was ever considered by him, or by the officers of the crown, as extending south of the Canal Carondelet.

The plea of prescription is not, in our opinion, supported by the evidence, and was properly overruled.

*Judgment affirmed.*

## SAME CASE—ON A RE-HEARING.

The proviso in the fourteenth section of the act of Congress of the 26th of March, 1804, erecting Louisiana into two territories, and providing for the temporary government thereof, contemplates two classes of titles: *first,* those granted according to the ordinances and usages of the spanish monarchy to heads of families, on the usual condition of settlement on the lands granted, provided such condition had been complied with before the cession to the United States; *secondly,* such as were applied for after the settlement had been made, commonly called permissions to settle with a *Requêta.* In both cases, we are to look to the usages of the spanish monarchy for the definition of an *actual settler,* rather than to subsequent acts of Congress providing for pre-emptions in favor of persons who may have *settled* upon, *inhabited,* and *cultivated* a part of the public domain. This proviso recognizes the authority of Spain to make certain grants, after the date of the treaty of San Ildefonso. Congress has never treated the question as exclusively a political one, nor decided that the sovereignty of Louisiana was changed at that period.

*Soulé, Derbigny,* and *Janin,* for the appellant.

*Preston,* for the plaintiff. 1. Grants by a government *de facto* of parts of a disputed territory in its possession, are valid against the state which had the right. 2. Where territory is acquired by treaty, or even by conquest, the rights of the inhabitants to private property, are always respected. 12 Peters, 748, 749.

BULLARD, J. A re-hearing was allowed in this case upon the single question, whether the grant to Guardiola, which was subsequent to the 1st of October, 1800, the date of the treaty of San Ildefonso, was protected by the proviso to the 14th section of the act of Congress of 1804, entitled ' an act erecting Louisiana into

two territories, and providing for the temporary government thereof.'

That section declares, 'that all grants for lands within the terri- tories ceded by the french republic to the United States by the treaty of the 30th of April, in the year 1803, the titles whereof were at the date of the treaty of San Ildefonso in the crown, government, or nation of Spain, and every act and proceeding subsequent thereto, of whatsoever nature, towards the obtaining of any grant, title, or claim to such lands, and under whatsoever authority transacted or pretended, be, and the same are hereby declared to be and to have been from the beginning, null, void, and of no effect in law or equity: *Provided nevertheless*, that anything in this section contained shall not be construed to make null and void any *bonâ fide* grant, made agreeably to the laws, usages, and customs of the spanish govern- ment to an actual settler on the lands so granted for himself, and for his wife and family ; or to make null and void any *bonâ fide* act or proceeding done by an actual settler agreeably to the laws, usages, and customs of the spanish government, to obtain a grant for lands actually settled on by the person or persons claiming title thereto, if such settlement, in either case, was actually made prior to the 20th day of December, 1803,' &c.

The proviso above recited contemplates two classes of titles: *First*, those granted according to the ordinances and usages of the spanish government, upon the usual condition of settlement upon the lands so granted, to heads of families, provided such condition was complied with before the cession to the United States ; and *secondly*, such as were applied for after the settle- ment was made, commonly called permissions to settle with a Requêta. In both cases we are to look, in our opinion, to the laws and usages of the spanish government for the definition of an *actual settler*, rather than to subsequent acts of Congress which provide for pre-emptions in favor of such persons as shall have *settled* upon, *inhabited*, and *cultivated* a part of the public domain. This proviso recognizes the authority of Spain to make certain grants after the date of the treaty of San Ildefonso, and therefore it cannot be said, that Congress has treated this as exclusively a political question, and absolutely decided, that the sovereignty was changed at that period. The only doubt is,

whether Guardiola can be classed in either of the categories expressed in the act of Congress. He exhibits a title in form to a small tract of land, which was appertinent to another tract already owned and possessed by him. The Intendant of the province, in the preamble to his patent, states him to be a resident of the city, and owner of a piece of land on the bayou road, where he has his dwelling, which property is deficient in depth to graze his cattle upon. It is for these reasons, that a small additional grant is made to him. This was done in conformity with the existing ordinances relative to the distribution of the public domain. Guardiola was certainly regarded by the intendant as *actually settled* on the land, to which his new grant was but an appendage ; and although the expression, used in the opinion of the court first pronounced, that the grant was *inhabited* and *improved*, was perhaps not strictly accurate, especially with reference to subsequent acts of Congress defining rights of pre-emption, yet substantially we consider the grant to Guardiola as embraced in the proviso which protects actual settlers before the cession to the United States ; and we cannot suppose Congress intended by the act in question, or by any subsequent legislation, to declare null and void those small grants, made *bonâ fide*, according to the usages of the spanish government, to inhabitants of the province, to meet the wants of a growing population.

The re-hearing being confined to this question, we have not thought it our duty to follow the counsel for the defendant in his argument upon other questions connected with this cause, nor to examine how far, upon other points, our view of the case differ from that of the highest tribunal in the Union. Looking upon Guardiola's grant as one made in good faith, according to the usages and ordinances of the Spanish government, and as having become private property, according to those laws and usages, and according to the treaties between France and Spain, and the law of nations, we consider it *protected not* merely by the proviso to the act of Congress first recited, but by the treaty of cession.

It is therefore considered that the judgment first pronounced, remain undisturbed.