Thomas W. Robertson, of Shreveport, for appellant.

Percy Saint, Atty. Gen., Percy T. Ogden, Asst. Atty. Gen., W. D. Goff, Dist. Atty., of Arcadia (E. R. Schowalter, Asst. Atty. Gen., of counsel), for the State.

O'NIELL, C. J. Appellant stands convicted of the offense of having intoxicating liquor in his possession for beverage purposes. The record contains two bills of exception, in which it is contended that the bill of information was invalid because the indorsement, on the back of it, of the number and title of the case, the offense charged and the date of filing, was not signed by the district attorney. There is neither a statutory nor common-law requirement that such an indorsement on a bill of information shall be signed by the district attorney. The bill of information itself was signed by the district attorney in his official capacity, which is all that was necessary to verify the bill.

The verdict and sentence are affirmed.

---

(111 So. 393)

No. 27592.

**CARRERE v. CITY OF NEW ORLEANS.**

(Oct. 5, 1926. Rehearing Denied Jan. 3, 1927.)

*(Syllabus by Editorial Staff.)*

1. Public lands ⚖️203—Probate sale in 1760 by highest judicial tribunal under French régime was not grant by French crown.

Probate sale of land in Louisiana in 1760 as property of succession of deceased and wife, though conducted by highest judicial tribunal under French régime, was not a grant by French crown.

2. Public lands ⚖️211—Grant confirmed by Congress in 1823 held to prevail over confirmation of 1858 so far as they were conflicting (Act Cong. Feb. 28, 1823 [3 Stat. 727]; Act Cong. June 7, 1858 [11 Stat. 545]).

Grant of land to M. confirmed by Act Cong. Feb. 28, 1823 (3 Stat. 727), being prior in date, *held* to prevail over confirmation to executors of estate of McD. by Act Cong. June 7, 1858 (11 Stat. 545), so far as latter conflicted with former confirmation as against contention that latter confirmed title of McD.'s remote grantor in 1760; especially in view of his chain of title, which did not include warranty title to such land, and fact that M. was not party to McD.'s suit against United States for confirmation of claim.

3. Public lands ⚖️212—Opinion of land office that sale by supreme council of province of Louisiana was equivalent to patent is not controlling.

Opinion of register and receiver of land office at New Orleans that sale by supreme council of province of Louisiana in 1760 was equivalent to patent is not controlling, since local land office is not judicial tribunal.

4. Public lands ⚖️211—Elder confirmee of inchoate rights to land in territory of Louisiana has better right than junior, regardless of date of origin of claim.

Inchoate rights to land in territory of Louisiana, which were of imperfect obligation when confirmed by Congress, take legal validity wholly from act of confirmation, and elder confirmee has better right than junior without reference to date of origin of their claim.

5. Public lands ⚖️211—Confirmation by Congress of claim to land is as high evidence of title as patent.

Confirmation by Congress of claim to land is as high evidence of title as patent, because it is direct grant of fee which had been previously in United States.

6. Public lands ⚖️221—Boundary separating tracts of land, title to which was confirmed by Congress, held properly established by government surveys (Act Cong. Feb. 28, 1823 [3 Stat. 727]).

Boundary separating tracts of land, title to which was confirmed by Act Cong. Feb. 28, 1823 (3 Stat. 727), *held* properly established by government surveys, official city maps, and

other documents, in suit between individual and city claiming disputed land, especially in view of recognition of such boundary by successive holders, since courts have no jurisdiction to determine correctness of government survey except by original proceeding in equity.

**7. Courts ⚖️107—Supreme Court's refusal under Constitutions of 1898 and 1913 to issue writ of review was not affirmance of judgment (Const. 1921, art. 7, § 2).**

Refusal of Supreme Court to issue writ of review to Court of Appeals was not affirmance of judgment complained of, under Constitutions of 1898 and 1913, but merely a declining to exercise jurisdiction; rule being different than under Const. 1921, art. 7, § 2, requiring appellate court to give reasons for declining to exercise supervisory jurisdiction.

**8. Adverse possession ⚖️19—Prescription; possession by city's permission without fencing is not adverse possession by city, where it showed no title.**

City cannot claim land by prescription by possession for 30 years through possession by its permission without fencing, since person claiming by possession alone without showing title must show adverse possession by inclosures.

**9. Adverse possession ⚖️30—Prescription; city cannot claim by adverse possession, where it had no apparent title, property was in obscure place, and taxes were assessed to individuals.**

City cannot claim land by adverse possession for 10 years, though land was fenced and used for tree nursery, where city had no apparent title, property was in obscure place, and taxes were assessed to individuals.

**10. Wills ⚖️675—Precatory recommendations in will that land devised to city should not be sold did not create trust or prevent alienation of title (Rev. Civ. Code, art. 1519).**

Title of city taking land under will was not in trust or entailed with any condition as to its being alienable or subject to private ownership, where condition that it should not be sold but revenues devoted to specified purposes, including public education, were but precatory recommendations, in view of Rev. Civ. Code, art. 1519.

Land and St. Paul, JJ., dissenting.

Appeal from Civil District Court, Parish of Orleans; Hugh C. Cage, Judge.

Petitory action by Ernest A. Carrere against the City of New Orleans. Judgment for plaintiff, and defendant appeals. Affirmed.

T. Semmes Walmsley and B. I. Cohn, City Attys., Francis P. Burns, Asst. City Atty., all of New Orleans (W. Catesby Jones, of New Orleans, of counsel), for appellant.

McCloskey & Benedict, of New Orleans, for appellee.

O'NIELL, C. J. This is a petitory action to recover two squares of ground in New Orleans. The civil district court gave judgment for the plaintiff. The defendant, city of New Orleans, took this appeal.

The squares are designated as No. 490 and 491 on the official maps of the city. They are bounded on their north side by White street and south by Broad street, and are separated by Thalia street; square No. 490 being bounded on its west side by Melpomene street and east by Thalia, and square No. 491 being bounded on its west side by Thalia and east by Erato street. The land was, until recently, in a swamp, in the rear of the city, and is not very valuable, but, as the attorneys for the city say in the opening sentence in their brief, the questions to be decided are of "tremendous importance," because the decision in this case will affect the title to other property of great value. This other property, referred to, the title to which is beclouded by the city's claim, is and has been for many years claimed by numerous individuals as private property, and is in part occupied by several mills and important manufacturing establishments.

The city claims a triangular tract of land, under a bequest to the city of New Orleans and the city of Baltimore, jointly, by the will of John McDonogh, who died in October, 1850, and whose claim was confirmed to his executors by an act of Congress on the 7th of June, 1858. U. S. Stat. at Large, vol. 11, c. 119, p. 545.

The city claims title also by the prescription of 10 and 30 years; but, aside from these pleas of prescription, which will be considered hereafter in this opinion, the city has no claim or pretension for more than a fourth interest in the land, because the city conveyed to one John L. Daniel, by notarial act, of date the 6th of June, 1859, a half of the city's claim to a half interest in the land, in consideration for services rendered by Daniel in procuring from Congress the act of confirmation; all of which was admitted by the city of New Orleans and decreed by this court in a suit brought by the city of Baltimore against the city of New Orleans and the heirs of Daniel for a partition of the triangular tract containing 177⅓ arpents, in 1867. See City of Baltimore v. City of New Orleans, 45 La. Ann. 526, 12 So. 878. Thereafter, in a petitory action brought by the city of New Orleans and the city of Baltimore and the transferees of John L. Daniel, against the Salmen Brick & Lumber Company, to recover six other squares of ground in this triangle, the plaintiffs claimed joint ownership in these proportions, viz.: City of New Orleans, ¼; City of Baltimore, ½; the widow and heirs of Jules Denis, ⅞₆; Mrs. Emily Daniel Seixas, 1⁄32; the succession of John Buckingham, represented by C. P. Cordill, administrator, 1⁄24; the succession of L. W. Desharoon, represented by C. P. Cordill, administrator, 1⁄24; and Mrs. Virginia Steele Hamilton, 1⁄16. In that suit, we sustained a plea of prescription of ten years set up by the defendant against the claims of the two cities and the coplaintiffs for the six squares of ground. City of New Orleans et al. v. Salmen Brick & Lumber Co., 135 La. 828, 66 So. 237.

There is no dispute about the location of this triangular tract which McDonogh laid claim to, and which he bequeathed to the cities of New Orleans and Baltimore. The base of the triangle rests exactly on the north line of Broad street, and extends from the west side of Washington avenue to Melpomene street, and continues straight eastward to a point and near the center of Erato street. The base of the triangle, according to the surveys, appears to be 1,492 feet 11 inches in length, measured from the northwest corner of the intersection of Washington avenue and Broad street, eastward, to the southeast corner of the triangle; the point being in and near the center of Erato Street. The apex of the triangle is about 49⅓ arpents northward from its base, and at a point 50 feet southeastward from the southeast corner of the intersection of Monroe street and Pear street. The triangle has a sharp point as its apex, the angle being only 5° 56′ 11″. It is formed by continuing northward, entirely across a tract known as the Macarty grant, the converging side lines of the Livaudais tract, lying immediately south of and adjoining the Macarty grant, until the continuations of these converging side lines northward meet.

The plaintiff traces his title to the Macarty grant. The city of New Orleans traces her title to the Livaudais grant. The two grants were confirmed by the same act of Congress, the Act of February 28, 1823 (U. S. Stat. at L. vol. 3, c. 15, p. 727). The Livaudais grant was for a tract of land fronting on the Mississippi river and extending northward between converging lines, supposed to be 80 arpents in depth, but in fact extending back only to the dividing line between it and the Macarty grant. According to all of the many official surveys and resurveys, made by the United States deputy surveyors and by the city engineers, both before and after the Macarty and Livaudais grants were confirmed, the dividing line between them was what is now the north line of Broad street, which is the south boundary of the two squares in contest. In other words, the two squares are on the north side, and therefore on the Macarty side, of what was the dividing

line between the Macarty grant and the Livaudais grant. That statement ought to decide the case in favor of the plaintiff, because he traces his title to the Macarty grant, and the city traces her title to the Livaudais grant.

The attorneys for the city advance two separate and distinct theories in support of the city's claim. Their first contention is that the converging side lines of the Livaudais grant should have been extended northward entirely across the Macarty grant, so as to include in the Livaudais grant the triangle now in dispute, which was not confirmed to Livaudais by the act of Congress of February 28, 1823. The second or alternative theory of the attorneys for the city is that the dividing line between the Macarty grant and the Livaudais grant should have been located about five squares further back, northward, from the river. They contend that the United States deputy surveyors should have placed the dividing line between the Macarty grant and the Livaudais grant exactly 80 arpents back from the river, and parallel with the front line of the Livaudais tract. According to all of the government surveys and maps, the dividing line between the Macarty grant and the Livaudais grant was originally established less than 80 arpents back from the river. There was no reason for placing the line exactly 80 arpents from the river. The southern boundary line of the Macarty tract extended very far, eastward and westward, beyond the side lines of the Livaudais tract, and was the rear or northern boundary of several other land grants or sections, fronting on the river and extending northward between converging side lines to the Macarty grant. All of the land grants fronting on the Mississippi river in that locality had their side lines converging as they extended northward—the reason being that New Orleans is the Crescent City—and none of these grants had a depth of 80

arpents. There are eleven such grants, adjoining each other, of which one is the Livaudais grant, all fronting on the river, as shown on the government survey made by George Dougherty, deputy surveyor, under contract of March 7 and May 1, 1836, and approved by the surveyor general on the 4th of June, 1836; and the converging side lines of all of these grants extended northward only to the Macarty grant, less than 80 arpents from the river. According to that survey, which conforms with all other government surveys, the eastern side line of the Livaudais grant was 200.64 chains, or about 68 arpents, and the western side line was 191.56 chains, or about 66 arpents, in length, measured from the first street along the river bank, northward to the Macarty grant. As we have said, the rear boundary line of the Livaudais tract, as thus located, one end of which line was 200.64 chains and the other end of which was 191.56 chains from the river, is now the north line of Broad street, which is the south boundary of the two squares in contest.

The fact that the location of this dividing line between the Macarty grant and the Livaudais grant coincides exactly with the north line of Broad street might seem to be an astonishing coincidence, but it is easily explained. Mrs. J. F. E. Livaudais sold the Livaudais tract, on the 24th of February, 1832, to four speculators, namely, Morgan, Peters, Pierce and Chase, and they laid off the tract in a suburb of city squares and streets, calling the front portion, extending from the river back to Howard street, "Faubourg Livaudais"; and, naturally, the last street in the rear of the subdivision, which is now Broad street, had for its northern boundary the northern boundary line of the Livaudais tract. Having sold all of the lots in the Faubourg Livaudais, between Howard street and the river, Messrs. Morgan, Peters, Pierce and Chase sold the remaining lots in

the Livaudais tract, extending from Howard street back to Broad street, to John McDonogh, on the 10th of February, 1836, and the cities of New Orleans and Baltimore sold off all of these lots in the McDonogh tract, extending from Howard street to Broad street, in 1859. Those facts are shown by the records and the official maps of the city, and are not disputed.

The contention of the city's attorneys that the confirmation by the Act of Congress of June 7, 1858, in favor of the executors of the estate of McDonogh, should have a retroactive effect and take precedence over the confirmation made to Macarty by the Act of Congress of February 28, 1823, is founded upon the fact that, on the 17th of April, 1760, a part of a large triangular tract, having a front of about 22 arpents on the Mississippi river and apparently including both the tract which was confirmed to Livaudais by the Act of February 28, 1823, and the triangular tract formed by continuing the side lines of the Livaudais tract northward to their point of intersection, was sold at public auction as the property of the succession of Ignace Broutin and wife, and was adjudicated to Delfant de Pontalba, the last and highest bidder. There is no positive proof that the French government had made a formal concession of the land to the Broutins when the probate sale was made, April 17, 1760; but the attorneys for the city contend that the probate sale itself was a concession by the French government, or, if it was not a concession, it is strong presumptive evidence that a concession of the land had been made by the French government, because the officers of the probate court, who conducted the proceedings and made the sale, were members of the Supreme Council of the Province of Louisiana, by whose order the sale was made. It was made with great pomp and ceremony, by Charles Marie Delalande Dapremont, councilor judge of said council, commissioner nominated to that effect, accompanied by Mr. Jean Baptiste Raquet, councilor of said council, acting as the King's Attorney General. But the sale did not purport to be a concession by the king of France, or anything more than an ordinary probate sale of property belonging to a deceased man and wife. The Supreme Council, or Superior Council, as it was called, was the highest court in the province of Louisiana, but we doubt that the tribunal had authority generally to make land grants for the crown. The council was, essentially, a judicial tribunal, as is shown by one of the king's edicts, quoted in the brief of the attorneys for the city, viz.:

"We give power to the Superior Council to decide, in the last resort, and without appeal, all contests, cases, and controversies between our subjects and all other persons in the said country, which said matters shall be determined by the council at its regular sessions."

The order for the sale, rendered by the Supreme Council, was "rendered at the request of Sieurs Delfant de Pontalba, De la Ronde and Ignace Broutin, coheirs in the succession of the deceased Sieur and Dame Broutin, plaintiffs, versus Sieur Marigny de Mandeville, also coheir in the said succession, defendant."

[1] This probate sale of the land, as the property of the succession of the deceased Ignace Broutin and wife, although conducted by the highest judicial tribunal under the French régime, was not a grant by the French crown. It furnishes a strong presumption, of course, that the Broutins either held a land grant from France or had such an equitable claim that they were entitled to receive a grant at any time; but that should have been and perhaps was presented and contended for before the Congress of the United States when J. F. E. Livaudais asked the Congress to confirm his title, and before Congress confirmed, simultaneously, the Macarty grant and the Livaudais grant, by the Act of February 28, 1823.

[2] McDonogh, in 1846, before petitioning Congress to confirm his claim, brought suit in the United States District Court, against the United States, to have his claim to the triangular tract of 177⅛ arpents confirmed, under the provisions of the Act of May 26, 1824 (4 Stat. 52), as revived by the Act of June 17, 1844 (5 Stat. 676). The judge of the United States District Court said, in his written opinion, that, in the absence of proof to the contrary, he would presume that the Supreme Council of the Province of Louisiana, in 1760, had authority to make grants of land, and that, although Broutin had no formal grant, the French officials, in their judicial capacity, recognized his title when they made the probate sale to Delfant de Pontalba. The court therefore entered a decree declaring that the probate sale made to Delfant de Pontalba on the 17th of April, 1760, was "valid against the United States," and that the 177⅛ arpents of land belonged to McDonogh, holding under the original grantee. In the decree, the court made the reservation, according to the statute, that, if it should be ascertained that any part of the land was held under titles emanating from the United States, or sold or otherwise disposed of by the United States, McDonogh was authorized to enter the like quantity of land in parcels conformable to the sectional divisions and subdivisions in any land office of the United States in Louisiana. The decree was, according to the statute, merely a disclaimer of any title in the United States, and did not purport to affect the title which Macarty had acquired by the confirmation by Congress 23 years before, or to affect the claim of any other individual. An appeal was taken by the United States, and the Supreme Court annulled the judgment and remanded the case to the District Court, with instructions to dismiss the suit for want of jurisdiction. The reason given by the Supreme Court of the United States for its de-

cree was that, if the allegations made in McDonogh's petition were true, and if he and his predecessors in title were continuously in peaceable possession of the land after the judicial sale to Delfant de Pontalba, as alleged, a case of perfect title was presented which was not within the jurisdiction of the District Court, under the Acts of 1824 and 1844. See United States v. Roselius et al., Executors. of McDonogh, 15 How. 35, 14 L. Ed. 590. The decree, of course, was merely that, as the case was presented in McDonogh's petition, the United States had no interest in or claim upon the land and should not have been sued, under the provisions of the Acts of 1824 and 1844. The decree could not be construed as affecting the title that had been confirmed to Macarty by the Act. of February 28, 1823. That is made plain by the fact that, in United States v. Ducros et al., 15 How. 38, 14 L. Ed. 591, a case very similar to the case now presented, and decided at the same sitting at which the case of the United States v. Roselius et al. was decided, the Supreme Court of the United States said:

"In 1793, certain legal proceedings were had before Baron de Carondelet in his judicial capacity, wherein the property now claimed is described as part of the estate of the grantor of the present claimant. But this did not amount to a confirmation of the title in his political character; and if it did, the title would be a perfect one, and beyond the jurisdiction of the District Court, under the Acts of 1824 and 1844."

Paraphrasing the quotation, we say that, in 1760, certain legal proceedings were had before the Supreme Council of the Province of Louisiana, in its judicial capacity, wherein the property now claimed by the city of New Orleans was described as a part of the estate of Mr. and Mrs. Ignace Broutin, alleged to be the grantors of the present claimant. But that did not amount to a confirmation of the title in the Supreme Council's political character; and, if it did, the title would be

a perfect one, and beyond the jurisdiction of the United States District Court, under the Acts of 1824 and 1844. What the court meant by saying that the title would be a perfect one if the land was formally granted by France while the territory of Louisiana was under the French régime was that the title would be perfect against any claim on the part of the United States.

The confirmation of Macarty's title, by the act of February 28, 1823, was founded upon a concession, or act of exchange, made by Baron de Carondelet, on the 22d of December, 1795, a copy of which is in the record as a part of the evidence in this case, indorsed, "Copy of concession to J. B. Macarty, of the 22 of December, 1795."

The same question that is presented in this case was before us in the case of City of New Orleans et al. v. Union Lumber Co., 145 La. 476, 82 So. 588, seven years ago; and we decided then that the Macarty grant, confirmed by the act of Congress of February 28, 1823, being prior in date, should prevail over the confirmation to the executors of the estate of McDonogh, by the Act of June 7, 1858, as far as the latter confirmation conflicted with the previous confirmation to Macarty. The land in contest in that suit was square No. 741, in this triangular tract of 177⅓ arpents confirmed to the executors of the estate of McDonogh by the act of June 7, 1858. That square is more than 80 arpents distant from the Mississippi river; but that is a matter of no importance because of the fact that the dividing line between the Macarty grant and the Livaudais grant was on the north line of what is now Broad street, and was not—although it was perhaps thought to be—80 arpents distant from the river. In the case of the City of New Orleans et al. v. Union Lumber Co., this court, speaking of the sale made by the Supreme Council of the Province of Louisiana, on the 17th of April, 1760, in the suc-

162 LA.—32

cession of Ignace Broutin and wife, to Delfant de Pontalba, said:

"Such an act of sale of lands belonging to private individuals, in probate proceedings, cannot possibly be construed into an action by the government; * * * and, if it could have borne such construction it would have been an inchoate title, and not a patent. Title did not pass under an inchoate grant. The title remained in the sovereign until a complete title was granted. * * *

"As petitioners claim under title, confirmed by act of Congress on June 7, 1858, which was subsequent in date to that of the confirmation by Congress of defendant's title in 1823, the defendant became the owner of the property under the first confirmation by Congress, which was in 1823."

[3] In recommending that the Congress should confirm McDonogh's claim for this triangle of 177⅓ arpents in the rear of the Livaudais tract, the register and the receiver of the land office at New Orleans, in 1846, expressed the opinion that the sale made by the Supreme Council of the Province of Louisiana, to Delfant de Pontalba, in the succession of Broutin, on April 17, 1760, was equivalent to a patent. That opinion, however persuasive, is not controlling, for the local land office was not a judicial tribunal. As we said in Pfister v. St. Bernard Cypress Co., 155 La. 575, 99 So. 454:

"The ruling of the United States Land Department that a French grant is a complete title which need not be confirmed, being no more than the opinion of the commissioner of the Land Office, is not conclusive, and does not preclude a legal investigation and judicial decision as between the parties."

If we should adopt the theory of the attorneys for the city, that Delfant de Pontalba had a complete title covering this triangular tract in the rear of the Livaudais grant, and that the acts of Congress confirming these grants were of no importance, the city would have yet no title to the triangle tract in the rear of the Livaudais grant, because, in all of the transfers subsequent to the probate sale to Delfant de Pontalba, the land conveyed,

and usually described as having a depth of 80 arpents from the river, was in fact only the Livaudais plantation, extending back from the river to the Macarty grant, as shown on the government surveys. Fuselier de la Claire, testamentary executor and tutor to the minor heirs of Delfant de Pontalba, sold to one Dargenton, on the 22d of September, 1760, a plantation fronting on the river, and described rather vaguely as "having eleven and a half arpents front by the depth and point of compass it runs to, which plantation formed formerly an angle of two equal sides, of which the basis fronting on the river had 22 arpents front by 80 in depth, but Mr. Broutin, to whom it belonged, having sold to Mr. Delino the quantity of 10½ arpents front by 40 in depth, and between parallel lines, the overplus of said angle forms consequently the superficie of said land and plantation which are now sold." Dargenton and one Laforcade sold the plantation to Jean Jacques Jacquelin, on the 13th of October, 1763, under the same indefinite description; and Jacquelin sold it to Pierre le Marquis, on the 29th of October 1767, under the same description. Pierre le Marquis and wife sold to Augustin Chatalon, on the 9th of September, 1768, under the same description, except that it was then said that "said plantation heretofore formed a *right angle* of which the base, fronting the river, had twenty-two arpents front *by eighty arpents in depth*," etc. (Italics ours.) By marriage contract between Santiago Francisco Enoul Livaudais and Maria Celeste de Marigny Mandeville, on the 12th of August, 1836, Livaudais brought into the marriage a tract of land described as having 10 arpents front by 80 in depth. Jacques Filipe Enoul Livaudais sold to Don Jacques Francois Enoul Livaudais, on the 28th of September 1836, a tract described as having 2 arpents front by 80 arpents deep, which the seller had bought from Mr. Chantalon, on the 3d of March, 1769, the boundaries to which were declared to have been established by Don Charles Trudeau de Laveau, surveyor general of the province, in 1797 or 1798, when the purchaser paid the price and took possession of the land. Joseph Enoul Livaudais sold to Jacques Philippe Enoul Livaudais, Francois Joseph Enoul Dugue Livaudais, Charles Enoul Dugue Livaudais, Louis Harang, and Mrs. Jeanne Marie Genevieve Enoul Dugue Livaudais, on the 11th of June, 1817, a tract described as having 3 arpents and 18 toises front and a depth of 80 arpents, "closing in the lines of the depth without any precise or determined measure"; and the purchasers sold to Jacques Francois Enoul Livaudais, on the 6th of July, 1818, the tract described as having 3 arpents and 18 toises front by the depth of 80 arpents, "and closing in the lines of said depth without fixed measure, as the said plantation now stands."

On the 25th of January, 1826, which was nearly three years after the Congress had confirmed the Macarty grant and the Livaudais grant by the Act of February 28, 1823, Jacques Francois Enoul Livaudais, the confirmee, transferred to his wife, Mrs. Marie Celeste Marigny Livaudais, in part settlement of her dotal rights, they being then separated from bed and board by a decree of the parish court, the plantation described as having a front of 16 arpents and 13 toises, and more if found, fronting on the river, of which front the 9 upper arpents were said to have a depth of 80 arpents, and the surplus "shows a depth of forty arpents." The plantation was said to be bounded above by a brickyard and the Faubourg Plaisance, and below by the Faubourg Lafayette; and Livaudais conveyed "also all the rights which may have been recognized as belonging thereto, according to said seller's titles, in the depth of the plantation presently sold, and beyond the depth already established, without any guaranty on his part for these same eventual rights, which he declares to have never alienated." The

expression, "and beyond the depth already established," very likely meant beyond the depth of the established plantation, or cultivated land, bounded by the adjacent faubourgs, or suburbs, and perhaps not more than 40 arpents in depth from the river. That is indicated in the sale by Mrs. Marie Celeste Marigny Livaudais to Messrs. Mathew Morgan, Samuel J. Peters, Levi Pierce and William H. Chase, on the 24th of February, 1832. There the plantation was said to be generally known as Mrs. Livaudais' plantation, in whose possession it was, measuring 16 arpents and 20 toises front on the river, with all the depth thereto belonging, "and the width it may have in the rear, in virtue of said titles." The reference to "the width in the rear" shows plainly that the plantation did not have the depth to the apex of the original triangle supposed to have belonged to Ignace Broutin and wife, but extended back only to the southern boundary line of the grant which had been confirmed to Macarty by Congress six years before. Mrs. Livaudais warranted the title only for 13 arpents and 8 toises front by the depth of 40 arpents, which is a strong indication that the measurement of the depth of the tract that had been confirmed to Livaudais was not important, if in fact known. For the remaining 3 arpents and 12 toises front, Mrs. Livaudais gave only such rights and actions of warranty as her husband had conveyed to her on the 25th of February, 1826, and whatever right he had to a double concession—meaning 80 arpents in depth. It was also recited in the deed that, in order that the purchasers might examine and study the history of the titles to the land they were buying, the seller delivered to them copies of all of the deeds, from the transfer to Mrs. Livaudais back to the 22d of April, 1751, "at which time," so it was said, "Mr. and Mrs. Broutin sold to Delino de Chalmette a certain tract of land of larger extent, a portion whereof is the tract of land presently sold." The statement that the tract of land then sold was a portion of the tract which Mr. and Mrs. Broutin had sold to Delino de Chalmette was a mistake, the meaning being, evidently, that the tract of land then sold was a part of the tract which Mr. and Mrs. Broutin had retained when they sold to Delino de Chalmette, and which remainder was sold afterwards to Delfant de Pontalba, in the probate proceedings in the succession of Ignace Broutin and wife. The chain of title to the Livaudais plantation does not go back to the title of Delino de Chalmette, whose land was described, invariably, as having a front of 10½ arpents and a depth of only 40 arpents, between parallel lines. It is plain, however, that Mrs. J. F. E. Livaudais, under whom the city claims title, acquired from her husband only the tract of land that was confirmed to him by the act of Congress of February 28, 1823, which, at the same time, confirmed the grant to Macarty, to whom the plaintiff traces his title.

We must bear in mind that Macarty, or the holder of the title acquired by him by the act of Congress of February 28, 1823, was not a party to the suit, and perhaps was not aware of the suit, which McDonogh brought against the United States, in 1846, for confirmation of his claim for the triangle now in dispute. There was no suggestion in McDonogh's petition that the triangle which he was claiming extended over and across a tract of land which had been confirmed to Macarty 23 years before McDonogh filed his suit. If there had been any such suggestion as that in McDonogh's suit, the Supreme Court of the United States, very likely, would have made some reservation in that respect, in the court's statement that, if McDonogh's allegations were true, and if he and his predecessors in title held peaceable possession continuously under titles emanating from Ignace Broutin and wife, a case of perfect title was presented, which was not within

the jurisdiction of the United States District Court, under the acts of 1824 and 1844. As we have demonstrated, McDonogh's chain of title, going back to Delfant de Pontalba, did not include this triangle, lying north of the Livaudais tract, but called for a depth of only 80 arpents, and in fact had a depth only to the Macarty grant. Besides, the decree of the Supreme Court of the United States, in McDonogh's suit against the United States, declining to exercise jurisdiction and declaring that the United States District Court did not have jurisdiction, must not be taken as an exercise of jurisdiction, or a pronouncement upon the validity of McDonogh's title—especially against parties who were not parties to the suit.

When the Congress confirmed McDonogh's claim, by the act of June 7, 1858, the government was careful—as it always is in such cases—to avoid prejudicing any claim held under a previous confirmation. The act of Congress ended with this proviso, viz.:

"Provided, that this confirmation shall only be construed as a relinquishment of all right and title of the United States, and shall not prejudice the legal claim of any other party, should such exist."

As we have said, McDonogh's title came directly from Messrs. Morgan, Peters, Pierce and Chase, who had bought from Mrs. J. F. E. Livaudais. When Morgan, Peters, Pierce and Chase sold to McDonogh, on the 10th of February, 1836, they had already sold off, in lots shown on a plan by Buisson, parish surveyor, on the 15th of March, 1832, all of the front part of the plantation, in the Faubourg Livaudais, between the river and Howard street, then called St. George street. They stipulated, with the utmost particularity, in selling to McDonogh what remained of the land that they had bought from Mrs. Livaudais, that they warranted the title only for a depth of 40 arpents from the river, and transferred only such title and rights and actions of warranty for the balance of the plantation

as they had acquired from Mrs. Livaudais on the 24th of February, 1832. The land lying immediately behind St. George (now Howard) street, and bet.reen it and the 40-arpent line, was a small triangle, described in the deed as measuring, according to the Buisson map, 2,375 feet on its northern boundary line (which was the 40-arpent line), 590 feet on its western boundary line, adjoining the Delasize tract, and 2,283 feet 6 inches "on the lower line of St. George street, being the last street of the Suburb Livaudais." Messrs. Morgan, Peters, Pierce and Chase warranted the title for that small triangular tract only, which was all that they then owned between the 40-arpent line and the river. As to the land behind this small triangle, and therefore extending from the 40-arpent line back to the Macarty tract—back to what is now the north line of Broad Street—Messrs. Morgan, Peters, Pierce and Chase transferred to McDonogh only such title and such rights and actions of warranty as they had acquired from Mrs. Livaudais, but without any guaranty on their part.

When Morgan, Peters, Pierce and Chase sold the Livaudais tract to McDonogh, on the 10th of February, 1836, Pierce owned also a tract described as lot No. 2 of the Macarty tract, having an area of 181 acres, immediately north of and adjoining the Livaudais tract. He had bought this tract of 181 acres, embracing the squares in contest in this suit, from the New Orleans Canal & Banking Company, Samuel Kohn, Laurent Millaudon and John Slidell, on the 4th of June, 1833, which was subsequent to Pierce's purchase of the Livaudais tract jointly with Messrs. Morgan, Peters and Chase. Therefore, in the sale made by Morgan, Peters, Pierce and Chase to McDonogh, it was stipulated that Levi Pierce was not selling any of the land that he had acquired from the New Orleans Canal & Banking Company, Samuel Kohn, Laurent Millaudon and John Slidell. The reservation

made by Levi Pierce in the deed to Mc-Donogh, after a recital of Pierce's acquisition from the Canal & Banking Company, Kohn, Millaudon and Slidell, concluded thus:

"Now, therefore, he, the said Levi Pierce, does, by these presents, reserve to himself any right acquired by him under the above mentioned deed of sale or under the persons from whom the said New Orleans Canal & Banking Company, the said Samuel Kohn, the said Laurent Millaudon and the said John Slidell have purchased, but does not reserve any right which he acquired from the said Mistress Livaudais by the aforementioned act before Louis T. Caire, notary, on the said twenty-fourth day of February, eighteen hundred and thirty-two; each party hereby standing upon the merits of their respective titles, as if the said Levi Pierce was no party to this act."

The expression, "as if the said Levi Pierce was no party to this act," meant, manifestly, as if McDonogh was buying, not from Levi Pierce but from Mrs. Livaudais, the interest which Pierce had bought from her. Levi Pierce sold to George Green, on the 1st of February, 1847, the land which Pierce had bought from the New Orleans Canal & Banking Company, Samuel Kohn, Laurent Millaudon and John Slidell. The land was described in the sale to Pierce, and in the reservation in his sale to McDonogh, and in the sale by Pierce to Green, as lot No. 2 on a plan of five lots, drawn by Charles F. Zimple, deputy city surveyor, on the 27th of April, 1833, the said lot No. 2 having an area of about 181 acres. It is not disputed that lot No. 2 on the Zimple map, which lot was a part of the Macarty grant, embraced the two squares of ground in contest in this suit.

Plaintiff's title for the two squares in contest is evidenced by a complete chain of deeds, duly recorded, emanating from B. Macarty, the original grantee, thus: Macarty sold a half interest in the tract, which we have described, to Mrs. C. B. Lanusse, on the 7th of March, 1823, and sold the remaining half interest to Samuel Kohn and Bernard Marigny on the 29th of April, 1831. Bernard Mar-

igny sold his fourth interest to Laurent Millaudon and John Slidell, on the 2d of September, 1831; and Mrs. C. B. Lanusse sold her half interest to the New Orleans Canal & Banking Company on the 19th of December, 1832. Samuel Kohn then owned a fourth, Laurent Millaudon and John Slidell each owned an eighth, and the Canal & Banking Company owned a half interest in the land. On the 4th of June, 1833, Kohn, Millaudon, Slidell and the Canal & Banking Company sold to Levi Pierce, as we have said, and, on the 1st of February Pierce sold to George Green. On the 20th of April, 1838, George Green recorded an acknowledgment that, in his purchase from Levi Pierce, he had bought only a fourth interest for himself, and had bought a third interest for William A. Gasquet, five twenty-fourths for James Currell, and five twenty-fourths for Samuel W. Oakey. James Currell died, and, on the 13th of January, 1844, his widow, Mrs. Victorine C. Currell, bought the five twenty-fourths interest in the land from his succession. Samuel W. Oakey went into bankruptcy, but, at the sale made by A. Bodin, syndic of the insolvent estate, on the 10th of May, 1844, Oakey repurchased the five twenty-fourths interest which he had surrendered to his creditors. George Green sold his fourth interest to William A. Gasquet on the 27th of August, 1845; and Samuel W. Oakey sold his five twenty-fourths interest to Peter Conrey, Jr., on the 17th of May, 1848. The land was described in all of the foregoing deeds as lot No. 2 on the Zimple map, having an area of 181 acres. It then belonged to Mrs. Victorine C. Currell, owning five twenty-fourths, William A. Gasquet, owning seven twelfths, and Peter Conrey, Jr., owning five twenty-fourths. Peter Conrey, Jr., sued his co-owners for a partition of the land, and, in the partition, acquired, as his share of the 181 acres, lots No. 127 to No. 144, inclusive, on a plan made by Benjamin Buisson, surveyor, dated the 17th of February,

1846. Squares No. 135 and 143, on the Buisson map, correspond with the squares No. 491 and No. 490, respectively, on the map referred to in this suit. Peter Conrey, Jr., went into bankruptcy, and the syndic of his insolvent estate sold the two squares to Patrick Irwin on the 28th of June, 1852, describing them as squares No. 135 and No. 143 on the Buisson map, and giving the boundaries by streets, thus showing that they are, respectively, the squares No. 491 and No. 490 in contest. Patrick Irwin died, and, by a judgment of court dated the 7th of June, 1881, his heir, John Irwin, and the widow, Catherine Manders Irwin, were sent into possession of the estate. Mrs. Catherine Manders Irwin died, and, on the 9th of May, 1881, the legatees sold her interest to John Irwin. He died, and, by a decree of court dated the 15th of July, 1884, Mrs. Johanna Dore Irwin, Edward Irwin and Mary Irwin were recognized as inheriting his estate. Mrs. Johanna Dore Irwin sold her interest in the lots to Edward Irwin on the 28th of January, 1882, and Mary Irwin sold her interest to Edward Irwin on the 11th of February, 1882. Edward Irwin died, and, by a decree dated the 15th of April, 1911, his widow, Mrs. Johanna Dore Irwin and their children, William P. Irwin, Joseph J. Irwin, Edward Irwin, Jr., and John J. Irwin, were recognized and given possession of the estate. The widow, Mrs. Johanna Dore Irwin, died, and, on the 9th of February, 1915, at a sale made to effect a partition, William P. Irwin having died without issue, the lots were adjudicated to the three surviving children, Joseph J. and Edward and John J. Irwin. Edward Irwin sold his interest in the lots to Joseph J. Irwin on the 12th of April, 1916, and John J. Irwin sold his interest to Joseph J. Irwin on the 7th of March, 1918, and Joseph J. Irwin sold the two lots to Ernest A. Carrere, the plaintiff in this suit, on the 22d of March, 1918.

In the deed from Samuel W. Oakey to Peter Conrey, Jr., dated the 17th of May, 1848, the tract of 181 acres, designated as lot No. 2 on the Zimple map, made on the 27th of April, 1833, was said to be bounded in front in part by the land of Livaudais, in part by the land of Delasize and in part by Faubourg Bouligny. The land was described substantially the same in the sale from Levi Pierce to George Green, on the 1st of February, 1837. The significance and importance of the statements of these front or southern boundaries of lot No. 2, containing 181 acres of the original Macarty grant, is that it was a recognition that the Livaudais tract, the Delasize tract and the Bouligny tract, as shown on the township map made by George Dougherty, United States deputy surveyor, approved June 4, 1836, extended back from the river, not 80 arpents, but to the Macarty tract. As we have said, in the sale from Messrs. Morgan, Peters, Pierce and Chase to McDonogh, on the 10th of February, 1836, the small triangle which they warranted the title for, lying between Howard (then St. George) street and the 40-arpent line, was said to measure 590 feet on its western boundary, adjoining the Delasize tract. That is one of the tracts which, with the Livaudais tract, was said, in the early deeds in the plaintiff's chain of title, to extend back to the Macarty tract, which was not 80 arpents back from the river, as shown on the Dougherty survey of 1836. The Zimple map, also, shows that the southern boundary of lot 2, containing 181 acres, of the original Macarty grant, was the southern boundary of the whole Macarty grant, which is the north line of Broad street and the southern boundary of the two squares in contest.

If anybody has the right to go behind the confirmation of the McDonogh claim, by the act of Congress of June 7, 1858, and, disregarding the date of the confirmation, claim this triangular tract of 177⅓ arpents by virtue of the probate sale of the property of the estate of Ignace Broutin and wife to Del-

fant de Pontalba, by the Supreme Council of the Province of Louisiana, on the 17th of April, 1760, the parties having such right are the heirs and assigns or legal representatives of Delfant de Pontalba, who has been dead 166 years, as shown by the sale made by Fuselier de la Claire, his testamentary executor, on the 22d of September, 1760. If the city of New Orleans does not stand upon the confirmation to McDonogh, by the act of June 7, 1858, she has no evidence of title, for she had not even a paper title, emanating from Delfant de Pontalba, except for that part of the Livaudais plantation extending from Howard street to the north line of Broad street; which part of the Livaudais tract was laid off in squares and lots and sold by the city of New Orleans and city of Baltimore at public auction on the 2d of May, 1859, according to the map made for the purpose by M. Vigne, city surveyor.

[4] If the title of the city of New Orleans, for this triangle extending northward from Broad street, emanated from the sale of the land of the succession of Ignace Broutin and wife to Delfant de Pontalba, in 1760, instead of depending upon the confirmation to Mc-Donogh in 1858, or if the claim urged by the city in this case were being urged by the heirs or assigns or legal representatives of Delfant de Pontalba, the claim would be rejected by the doctrine announced in Chouteau v. Eckhart, 2 How. 344, 11 L. Ed. 293, and never departed from, viz.:

"The obligation of perfecting titles under Spanish concessions, which was assumed by the United States in the Louisiana treaty, was a political obligation, to be carried out by the legislative department of the government. Congress, in confirming or rejecting claims, acted as the successor of the intendant-general; and both exercised, in this respect, a portion of the sovereign power.

"The act of Congress, passed on the 13th of June, 1812, confirming the titles and claims of certain towns and villages to village lots and commons, gave a title which is paramount to a title held under an old Spanish concession, confirmed by Congress in 1836."

In the case of Dent v. Emmeger, 14 Wall. 308, 20 L. Ed. 838, the defendant, village of Carondelet, claimed title to certain commons which had been surveyed in 1817, and re-surveyed, the survey and resurvey having been approved July 29, 1834, all in contemplation of the village's having the commons confirmed to it, pursuant to the Act of June 13, 1812 (2 Stat. at L. 748), and the Act of April 29, 1816 (3 Stat. at L. 325), and the Act of January 27, 1831 (4 Stat. at L. 435); but the title had not been confirmed by an act of Congress. The plaintiff, Dent, held title from Gabriel Cerre, who held a patent which had been issued pursuant to an act of Congress (Act of July 4, 1836 [5 Stat. at L. 127]), the confirmation being founded upon a complete and formal concession made by the Lieutenant Governor of Upper Louisiana to Gabriel Cerre in 1789. It was held that Cerre's title, notwithstanding it was evidenced by a formal concession made previous to the Treaty of Cessions of 1803, was an imperfect or inchoate title until it was confirmed by Congress by the act of 1836, and, being confirmed after the lines of the commons had been run and established by the surveys of 1817 and 1824, could not prevail over the title of the village, founded upon those surveys. The court said:

"1. Titles which were perfect before the cession of the territory of Louisiana to the United States, continued so afterwards, and were in no wise affected by the change of sovereignty.

"2. But inchoate rights which were of imperfect obligation, when confirmed by Congress took their legal validity wholly from the act of confirmation, *and the elder confirmee has always a better right than the junior, without reference to the date of the origin of their respective claims.* (The italics are ours.)

"3. After the passage of the act of 1812, the claim of the village of Carondelet was still indefinite and unenforceable, until made definite and located by the survey prescribed and provided for.

"4. The survey made in 1817 and approved by the surveyor general in 1834, is binding upon the village and estops it from claiming any land beyond the lines thus established.

"5. The Cerre claim was confirmed after the

lines of the commons had been defined and established by the surveys of 1817 and 1834, and was subject to the title of the village, and cannot prevail against its title.

"6. Documents relating to surveys and a plat of a survey made since the resurvey in 1834, were incompetent evidence."

[5] In Lessee of Grignon et al. v. Astor et al., 2 How. 344, 11 L. Ed. 283, the court defined and stated the effect of a confirmation of a land grant by an act of Congress thus:

"A title to land becomes a legal title when a claim is confirmed by Congress. Such confirmation is a higher evidence of title than a patent, because *it is a direct grant of the fee, which had been previously in the United States.*" (Italics ours.)

In Les Bois v. Bramell, 4 How. 449, 11 L. Ed. 1051, the court cited with approval its ruling in Chouteau v. Eckhart, 2 How. 344, 11 L. Ed. 293, and said:

"The power of granting the public domain was in Morales, who resided in New Orleans. His regulations were in force in Upper Louisiana, and by them the title to land held under a concession and survey was not perfected until ratified by him and a final grant issued.

"This power was in a great degree a political power, and, by the treaty, the United States assumed the same exclusive right to deal with the title, in their political and sovereign capacity. The courts of justice cannot, without legislation, execute the power, because the holder of an incomplete title has no standing in court.

"A confirmatory act, passed by Congress in 1836, does not reach back to the original concession, and exclude grants of the same land made in the intermediate time, either by Congress itself, or a board of commissioners, or the district court, acting under its authority."

Accordingly, the confirmatory act passed by Congress on the 7th of June, 1858, confirming the claim of McDonogh, did not reach back to an original concession to Ignace Broutin—if in fact there ever was such a concession—and exclude the grant of the same land confirmed to Macarty by the act of Congress of the 28th of February, 1823.

This court, of course, has always applied the rule established by the Supreme Court of the United States in the cases which we have cited. Pontalba v. Copland, 3 La. Ann. 86; Lobdell v. Clark, 4 La. Ann. 100; Purvis v. Harmanson, 4 La. Ann. 422; Duplessis v. Miller, 6 La. Ann. 683; Helluin v. Minor, 12 La. Ann. 125; Fluker v. Doughty, 15 La. Ann. 673; Perkins v. Vincent, 47 La. Ann. 580, 17 So. 126; Broussard v. Pharr, 48 La. Ann. 234, 19 So. 272; Betz v. Illinois Central Railroad Co., 52 La. Ann. 923, 24 So. 644; Jopling v. Chachere, 107 La. 522, 32 So. 243; Louisville & Nashville Railroad Co. v. Penn, 137 La. 526, 68 So. 859; City of New Orleans et al. v. Union Lumber Co., 145 La. 476, 82 So. 588; Brott v. New Orleans Land Co., 151 La. 134, 91 So. 653.

In Duplessis v. Miller, the court said:

"Where both parties claim under a confirmed Spanish grant, the first confirmation must take the land."

In Fluker v. Doughty, the court said:

"When there is a conflict between the certificate of confirmation by the United States of an inchoate Spanish grant and the orders of survey, the act of confirmation must prevail and determine the nature and extent of the rights of the original claimant."

In Jopling v. Chachere, the court said:

"The confirmation by the old board of commissioners for the Western district of the territory of Orleans, under the act of Congress of 1807, of a claim to land based upon occupancy and settlement, followed by the confirmation by Congress of the claim so confirmed, operated as effectually as a grant or quitclaim from the government."

In Louisville & Nashville Railroad Co. v. Penn, the court said:

"A land grant confirmed by Congress in 1820 (Act May 11, 1820, c. 87, 3 Stat. 573), cannot be affected by a state selection of the same land in 1850, under the swamp land grant of March 2, 1849 (Act March 2, 1849, c. 87, 9 Stat. 352), and the approval of the selection by the commissioners of general land office."

In City of New Orleans et al. v. Union Lumber Co. the court said:

"A sale of land belonging to private individuals in probate proceedings cannot be construed into

an action by the government, and the title acquired thereby cannot be said to have emanated from the government.

"Where plaintiff's authors possessed of an inchoate title did not file notice with the United States Commissioner, as required by Act Cong. April 25, 1812, or within the various extensions of time made subsequent to the adoption of the act, and it was never filed, their alleged grant of 1760 cannot therefore be received in evidence to support plaintiff's title against defendant's confirmation of title by Congress in 1823 (Act Cong. Feb. 28, 1823).

"Where petitioners claimed land under title confirmed by Act Cong. June 7, 1858, and defendants claimed title by confirmation in 1823 (Act Cong. Feb. 28, 1823), defendants had superior title."

In Brott v. New Orleans Land Co. the court said:

"Under the express provisions of Act Cong. March 2, 1805 (Act April 25, 1812, No. 4), and Act June 17, 1844, incomplete claims under grants from the French and Spanish governments, when not asserted within the time allowed, were properly ignored by the land department, *and the government was free to dispose of the lands as its legislative department saw fit.*" (Italics ours.)

The reason why the acts of Congress confirming French or Spanish land grants in the Louisiana Territory are controlling in contests between two confirmees under conflicting confirmations is that the obligation which was assumed by the United States, in the Treaty of Cession, to confirm titles held under French or Spanish concessions, was a political obligation, to be performed by the legislative, not the judicial, department. If the act of Congress of June 7, 1858, confirming this triangle of 177⅓ arpents to John McDonogh, had confirmed the title to the heirs and legal representatives of Ignace Broutin or Delfant de Pontalba, and if the heirs and legal representatives of the confirmee were here claiming the land in opposition to the title acquired by the confirmation to Macarty by the act of February 28, 1823, we would be compelled by the jurisprudence established by the Supreme Court of the United States to say that the confirmation to Macarty, being first in date, must prevail. The city of New Orleans, however, has no title for this triangle of 177⅓ arpents from Ignace Broutin or Delfant de Pontalba. The city's title for the triangle goes back only to the confirmation to McDonogh, by the act of June 7, 1858. There is therefore no merit in the contention of the attorneys for the city that the act of Congress of June 7, 1858, reached back and confirmed the title as of date the 17th of April, 1760, when the Supreme Council of the Province of Louisiana, in the sale to Delfant de Pontalba, in the succession of Ignace Broutin and wife, took it for granted that the Broutins had a land grant or concession from the crown.

[6] The second or alternative contention of the attorneys for the city is that the northern boundary of the Livaudais tract—of which the part lying between Howard street and Broad street was bought by McDonogh from Morgan, Peters, Pierce, and Chase—should be moved back, or northward, from the north line of Broad street, about 12 arpents, say six blocks, to a line near Hagan avenue, so as to be exactly 80 arpents from the river. The same contention was made by the plaintiffs in the suit of the City of New Orleans et al. v. Union Lumber Co., 145 La. 476, 82 So. 588; but we said then that the line had to remain where it was originally established, at Broad street. We said:

"Government surveys, official city maps, and other documents place the rear line of the Livaudais tract about or near Broad street, which was and is the dividing line between the Livaudais and Macarty tracts."

Further investigation shows now beyond doubt that the dividing line between the Livaudais tract and the Macarty tract was exactly on what is now the north line of Broad street. It was said in the opinion in the Union Lumber Company's Case that the north line of Broad street was 80 arpents from the river; but that was a matter of no import-

ance. The question to be decided in that case was, and is now, not how far from the river, but where, on the ground, was the dividing line between the Macarty grant and the Livaudais tract established, when the two grants were confirmed, simultaneously, by the act of Congress of February 28, 1823.

Messrs. Morgan, Peters, Pierce, and Chase recognized, when they had the land surveyed and platted by the parish surveyor, Buisson, on the 15th of March, 1832, and when they sold off the Faubourg Livaudais, between Howard street and the river, that the north boundary of the Livaudais tract was the north line of Broad street. McDonogh also recognized that the north line of Broad street was the northern boundary of what remained of the Livaudais tract when he bought it from Morgan, Peters, Pierce, and Chase, on the 10th of February, 1836, and described it by reference to the Buisson plan. The city of New Orleans and the city of Baltimore also recognized that the northern boundary line of the land bequeathed to them by McDonogh was the north line of Broad street; for they had a survey and plat of the land made by L. H. Pilie, city surveyor, dividing the tract into 1,792 city lots; and they sold off the lots at public auction on the 2d of May, 1859, disposing of all of the land, from Howard street back to Broad street, all in accordance also with the Buisson plan, by which McDonogh had bought what was left of the Livaudais tract.

The city of New Orleans and city of Baltimore and the transferees of John L. Daniel again recognized that the dividing line between the triangle now in dispute and the original Livaudais plantation was at the north line of Broad street when the city of Baltimore sued the city of New Orleans and the heirs of John L. Daniel for a partition of the triangle behind Broad street. See City of Baltimore v. City of New Orleans, 45 La. Ann. 526, 12 So. 878. It was said in the opinion rendered in that case (45 La. Ann. page 528 [12 So. 878]), that the cities of Baltimore and New Orleans had sold to third parties, on the 2d of May, 1859, 108 squares of ground, "under a plan by which the property had been laid off in streets and squares." It seems to have been assumed by the interveners in the suit, transferees of John L. Daniel, and by the court, that the 108 squares that were sold by the cities on the 2d of May, 1859, were a part of the triangular tract of 177⅓ arpents which the city of Baltimore was then seeking to partition; but that was, manifestly, a mistake, because the squares that were sold off by the two cities, at public auction, on the 2d of May, 1859, were in that part of the Livaudais tract which McDonogh had bought from Messrs. Morgan, Peters, Pierce, and Chase, extending from Howard to Broad street, as shown on the Buisson plan and on the map made by L. H. Pilie, city surveyor, for the purpose of the auction sale. The cities have never attempted to carry out the partition of the triangular tract of 177⅓ arpents, which was ordered by the decree of the district court, affirmed by this court, in City of Baltimore v. City of New Orleans, supra.

We adhere to our ruling in the case of the City of New Orleans v. Union Lumber Company, that the dividing line between the Macarty grant and the Livaudais grant, established at the north line of Broad street by the government surveys a century ago, and observed and recognized by the adjacent landowners ever since, cannot be changed now in an action at law. Whether a government survey as originally made is correct or incorrect is for the land department alone to determine, and as to which the courts have no jurisdiction except by original proceedings in equity. 10 Encyc. of U. S. Supreme Court Reports, p. 80. That proposition was put at rest by the Supreme Court of the United States in Cragin v. Powell, 128 U. S. 691, 9 S. Ct. 203, 32 L. Ed. 566, thus:

"That the power to make and correct surveys of the public lands belongs to the political department of the government, and that, whilst the lands are subject to the supervision of the General Land Office, the decisions of that bureau in all such cases, like that of other special tribunals upon matters within their exclusive jurisdiction, are unassailable by the courts, except by a direct proceeding; and that the latter have no concurrent or original power to make similar corrections, if not an elementary principle of our land law, is settled by such a mass of decisions of this court that its mere statement is sufficient. Steele v. St. Louis Smelting & Ref. Co., 106 U. S. 447, 454, 455 [1 S. Ct. 389] (27 L. Ed. 226, 229), and cases cited in that opinion; United States v. San Jacinto Tin Co. [(C. C.) 23 F. 279] 10 Sawy. 643, affirmed in 125 U. S. 273 [8 S. Ct. 850] (31 L. Ed. 747); United States v. Flint [Fed. Cas. No. 15,121] 4 Sawy. 61, affirmed in U. S. v. Throckmorton, 98 U. S. 61 (25 L. Ed. 93); Henshaw v. Bissell, 85 U. S. (18 Wall.) 255 (21 L. Ed. 835); Stanford v. Taylor, 59 U. S. (18 How.) 409 (15 L. Ed. 453); Haydel v. Dufresne, 58 U. S. (17 How.) 23 (15 L. Ed. 115); West v. Cochran, 58 U. S. (17 How.) 403 (15 L. Ed. 110).; Jackson v. Clark, 26 U. S. (1 Pet.) 628 (7 L. Ed. 290); Niswanger v. Saunders, 68 U. S. (1 Wall.) 424 (17 L. Ed. 599); Snyder v. Sickles, 98 U. S. 203 (25 L. Ed. 97); Frasher v. O'Connor, 115 U. S. 102 [5 S. Ct. 1141] (29 L. Ed. 311); Gazzan v. Phillips, 61 U. S. (20 How.) 372 (15 L. Ed. 958); Pollard v. Dwight, 8 U. S. (4 Cranch) 421 (2 L. Ed. 666); Taylor v. Brown, 9 U. S. (5 Cranch) 234 (3 L. Ed. 88); McIver v. Walker, 13 U. S. (9 Cranch) 177 (3 L. Ed. 694); Craig v. Radford, 16 U. S. (3 Wheat.) 594 (4 L. Ed. 467); and Ellicott v. Pearl, 35 U. S. (10 Pet.) 412 (9 L. Ed. 475).

"The reason of this rule, as stated by Justice Catron in the case of Haydel v. Dufresne, is 'that great confusion and litigation would ensue if the judicial tribunals were permitted to interfere and overthrow the public surveys on no other ground than an opinion that they could have the work in the field better done and divisions more equitably made than the department of public lands could do.'

"It is conceded that this power of supervision and correction by the Commissioner of the General Land Office is subject to necessary and decided limitations. Nor is it denied that, when the Land Department has once made and approved a governmental survey of public lands (the plats, maps, field notes and certificates all having been filed in the proper office), and has sold or disposed of such lands, the courts have power to protect the private rights of a party who has purchased, in good faith, from the government against the interferences or appropriations of corrective resurveys made by that department subsequently to such disposition or sale."

This court, of course, has adhered to the rule laid down by the Supreme Court of the United States in the decisions cited.

"The making, correcting, and approving of surveys of the public lands is under authority of the General Land Office of the United States, and the decisions of that department of the government are not subject to correction by the courts in suits between individuals." Leader Realty Co. v. Lakeview Land Co., 142 La. 169, 76 So. 599.

See, also, Board of Directors v. New Orleans Land Co., 138 La. 32, 70 So. 27.

"If the government survey of a township erroneously locates grants thereon, the power to correct the survey belongs exclusively to the political department of the government, and its decisions cannot be reviewed by the courts in suits between individuals." Brott v. New Orleans Land Co., 151 La. 134, 91 So. 653.

The fact that J. F. E. Livaudais petitioned the Congress to confirm his claim for a depth of 80 arpents from the river cannot prevail over the fact that the government surveys showed that the rear boundary of the claim was less than 80 arpents from the river.

"Where government subdivision was shown by field notes to be fractional quarter section, one corner being cut off by private grant, and was patented as a fractional quarter section, owner thereof had no title to the part cut off, though patent, by mistake, gave acreage as 160.66 acres." Gilmore v. Lyon Lumber Co., 159 La. 18, 105 So. 85.

[7] The city of New Orleans cites as authority, in support of its claim, a decision rendered by the Court of Appeal for the parish of Orleans, in a case entitled Quaker Realty Company, Praying for Confirmation of Title, 10 Orleans Ct. App. 79. The decision in that case was rendered in 1914, and is, in every respect, contrary to the decision rendered by the Supreme Court in the case of City of New Orleans v. Union Lumber Co., 145

La. 476, 82 So. 588, in 1919. It is argued on behalf of the city that we affirmed the judgment of the Court of Appeal in the Quaker Realty Company's Case by denying a petition for writ of review. The refusal to issue a writ of review, however, under the Constitutions of 1898 and 1913, was not an affirmance of the judgment complained of, but merely a declining to exercise the jurisdiction of the Supreme Court to review the case. Under the Constitution of 1921, art. 7, § 2, an appellate court is required to give its reason or reasons when it declines to exercise its supervisory jurisdiction. Therefore, when the Supreme Court now refuses to issue a writ of review in a case decided by one of the Courts of Appeal and assigns as the reason for refusing the writ that the judgment is correct, it may be said that the Supreme Court affirms or at least approves the decision. But it was not so under the Constitution of 1898 and of 1913, when writs were refused without an assignment of any reason, and were sometimes refused because of some informality in the application, or because the case involved only questions of fact, or questions of law that were deemed not important enough to warrant an interference with the decree of the court of appeal. In the Quaker Realty Company's Case, the Court of Appeal ruled that the dividing line between the Macarty grant and the Livaudais grant was not at Broad street, but near Hagan avenue, 80 arpents distant from the river, and therefore that the lots then in dispute were not within the Macarty grant, but within the tract which was confirmed to Livaudais by the act of Congress of February 28, 1823. Having so decided, the court's further ruling that the confirmation to the executors of McDonogh, by the act of Congress of June 7, 1858, reached back to a supposed concession to Ignace Broutin in 1760, was not necessary for a decision of the case in favor of the city of New Orleans, and the decision in that respect may be regarded as obiter dictum. It may be that this court so regarded the ruling, and regarded the finding by the Court of Appeal that the Macarty line was established, not at Broad street, but near Hagan avenue, as a finding of fact, on which the Supreme Court did not see fit to review the evidence in a case that was not appealable to the Supreme Court. Be that as it may, the decision was not rendered by a court of last resort, and, if it was, it would have to be considered overruled by the subsequent decision in the Union Lumber Company's Case, which we adhere to.

[8] The city's plea of prescription by possession for 30 years is not well founded. It is based upon the fact that the chief clerk for the mayor of the city gave to a colored man named Essex Johnson on the 5th of December, 1883, a written permit "to occupy city property not used by the city on the Melpomene Canal, between White and Broad street, right bank of the canal, until such time as the authorities may demand of him to vacate the same." He built a hut on the bank of the canal, and it happened to be on the corner of square No. 490. The land was not under fence, but in a dense cypress swamp, or "jungle," as the witnesses described it, and it was therefore not apparent to any one that Johnson's hut was on private property.

A person claiming "by possession alone, without showing any title, * * * must show an adverse possession by inclosures, and his claim will not extend beyond * * *." Prevost's Heirs v. Johnson, 9 Mart. (O. S.) 123; Ellis v. Prevost, 19 La. 251; Vicksburg, S. & P. Ry. Co. v. Le Rosen, 52 La. Ann. 197, 26 So. 854; Albert Hanson Lumber Co. v. Riggs Cypress Co., 130 La. 772, 58 So. 567.

The prescription of 30 years, founded upon the fact that Essex Johnson had his hut on the bank of the Melpomene Canal by permission of the mayor of the city, was pleaded

by the city in the Union Lumber Company's Case, and it was held that such possession as Johnson had was not sufficient to sustain the plea. The attorneys for the plaintiff in this case objected to the introduction in evidence of the document purporting to allow Essex Johnson to occupy space on the bank of the Melpomene Canal, on the ground, first, that the mayor, or his clerk, had no authority to issue the permit; and, second, that the document was not signed by the mayor, but merely stamped with his signature, by the clerk, with a rubber stamp. We doubt that the document was admissible in evidence, but, giving it all of the effect that is claimed for it, in connection with the testimony of Essex Johnson himself, it is not sufficient to sustain the plea of prescription of 30 years.

[9] The city's plea of prescription of 10 years is founded upon the following facts: In 1908, the city had these two squares surveyed and ran one strand of barbed wire fencing around each square, and placed on each square a sign reading: "For Sale. Apply to the Mayor, City Hall, or to James J. McLoughlin, 1009 Hibernia Bank Bldg." McLoughlin was the attorney for the city of Baltimore. That was more than 10 years before this suit was filed. Soon afterward, but less than ten years before the suit was filed, the park commissioner began using the land for a tree nursery for raising trees for ornamenting the streets and parks. The president of the park commission obtained from the attorney representing the city of Baltimore and from the city attorney of New Orleans written permission to use the land for the purpose, "pending the final termination of the litigation over the ownership of the property." It appears that the president of the park commission also sought and obtained the consent of Edward Irwin, who then owned the squares, to use them for the tree nursery. The city had been assessing the squares in the name of Patrick Irwin and collecting the taxes annually since 1863, and the city continued to assess the squares to the Irwins, and afterwards to Carrere, and to collect the taxes annually, after the city began using the land for a tree nursery, and up to the time of the filing of this suit. There are several reasons why the plea of prescription of ten years cannot prevail. In the first place, the city had no apparent title, or deed, which, on its face, conveyed title for this land. Secondly, the property was in such an obscure place that the city's manifestations of taking possession were not apt to be observed by the owner of the land, or by the public. Thirdly, the obtaining of Irwin's permission by the president of the park commission, and the continuing to assess the land to its owner and to collect taxes from him annually, were not consistent with the city's claim of adverse possession. The city's plea of prescription of ten years, as well as the prescription of 30 years, was therefore properly overruled by the civil district court.

[10] The plaintiff in this case has set up in his petition, as an alternative title, a tax sale to the state, made in 1885, for the unpaid taxes of 1882 and 1883, assessed in the name of John Irwin, and a deed from the state auditor to Edward Irwin, in 1895, under the provisions of Act No. 80 of 1888. In support of the tax title, the plaintiff pleaded the prescription of three years, under article 233 of the Constitution of 1898, and pleaded that the city was estopped to question the tax title acquired by Edward Irwin, because, after the sale to him, the city continued to assess the property in his name and to collect the taxes from him annually until 1911, the year in which he died, and thereafter collected the taxes from his widow and heirs, etc. There is no dispute about the facts in that respect. The city contends that the tax sale was invalid—that the property was not subject to taxation because it was held in trust by the city for educational purposes,

under the terms of the will of John McDonogh. We are not so sure of that. It is true that, by the terms of McDonogh's will, all of the lands that were bequeathed to the city of New Orleans and city of Baltimore were given with the stipulation that the property should never be sold but should be rented and the revenues devoted to certain specified purposes, including public education. But the state of Louisiana and the state of Maryland attacked the will in the state court, and the collateral heirs of McDonogh attacked it in the federal court, on the ground that the conditions of the bequest were fidei commissa and prohibited substitutions, forbidden by the Civil Code. The Supreme Court of the United States and this court both held that the stipulations in the will were not prohibited substitutions, but precatory recommendations, which, according to article 1519 of the Civil Code, might be deemed not written, leaving the bequest valid and unconditional. See Executors of John McDonogh et al. v. Mary Murdoch et al., Heirs of John McDonogh, 15 How. 367, 14 L. Ed. 732, and State of Louisiana (State of Maryland Intervening) v. Executors of John McDonogh and City of New Orleans, 8 La. Ann. 171. The title acquired by the two cities was therefore not in trust, or entailed with any condition, as to its being alienable or subject to private ownership. We have held that the property was subject to the laws of prescription, even against the city of New Orleans, and that, at least, the half interest acquired by Baltimore, and the fourth interest acquired by John L. Daniel from the city of New Orleans, was subject to taxation. City of New Orleans et al. v. Salmen Brick & Lumber Co., 135 La. 828, 66 So. 237. We shall abstain from deciding at this time—because it is now not necessary to decide—the question of validity of the plaintiff's tax title, enforced as it is by the plea of prescription of three years and the plea of es-

toppel. Our decision that the title acquired by the plaintiff in virtue of the confirmation of the claim of Macarty by the act of Congress of February 28, 1823, is superior to the claim of the city of New Orleans under the confirmation of the claim of McDonogh by the act of June 7, 1858, is, perhaps, subject to review by the Supreme Court of the United States. So, also, perhaps, is our decision that the dividing line between the Macarty grant and the Livaudais grant (which were confirmed simultaneously by the act of Congress of February 28, 1823), having been established by the government surveys at what is now the north line of Broad street, is not subject to removal by the courts, in an action at law, even though it may have been intended originally to place the line 80 arpents distant from the river, which it is not. We rest our decision of the case upon those propositions, and leave undecided the question of validity of the plaintiff's tax title and the consequent plea of prescription and estoppel.

The judgment is affirmed.

ST. PAUL, J., dissents.

LAND, J. (dissenting). This is a petitory action in which plaintiff seeks to be decreed the owner of squares 490 and 491, fronting on Broad street, and bounded by Melpomene avenue, S. White, Erato, and Thalia streets in the city of New Orleans. The defendant, the city of New Orleans, claims that these squares are located within the 80 arpents line of the Livaudais tract, which it is contended was acquired by John McDonogh on February 10, 1836, by notarial act of sale from Morgan, Peters, Chase, and Pierce, under title tracing back, through Jacques Francois Enoul Livaudais, to an adjudication made in the succession of Broutin and wife to De Pontalba, on April 17, 1760, by the Supreme Council of the Province of Louisiana.

Defendant contends that this adjudica-

tion was, in effect, a grant from the French government, and that the city of New Orleans, as colegatee with the city of Baltimore under the last will and testament of John McDonogh, became the owner of an undivided one-half interest in this property, by virtue of the joint bequest made by the testator to said legatees for public school purposes.

The contention of plaintiff, on the other hand, is that the adjudication in question was a mere judicial sale, or decree made by an ordinary court of justice, and was not, in any proper sense, a governmental act or concession from the French authorities.

Plaintiff trades title to what is called the Macarty grant, which is asserted to be a special grant made by the Baron de Carondelet to Jean Baptiste Macarty in the year 1795.

Plaintiff claims title also under an alleged grant, or confirmation, to the claimants of the Macarty grant by Congress in the year 1823, and contends that this grant, or confirmation, was made prior to that of the claimants of the McDonogh tract, and must, therefore, take precedence over the title of the city of New Orleans, holding under the McDonogh claim, which was confirmed by Congress in 1858 as to all of the land in the Broutin or Livaudais tract, extending from the 80 arpents line to the apex of the triangle within the limits of which the Broutin or Livaudais tract is embraced.

Plaintiff asserts title, also, in the alternative, under a state auditor's deed.

1. Issues similar to these here involved arose in City of New Orleans v. Union Lumber Co., 145 La. 476, 82 So. 588. The court held in that case that the document offered in evidence and indorsed, a "Copy of Concession to J. B. Macarty of the 22 of December, 1795," "shows that the so-called grant from the French [Spanish] government in 1795 to Macarty was an exchange of property made by the government with Macarty, and not a grant or patent."

The transfer from France to Spain by the secret Treaty of Fontainebleau occurred on November 3, 1762, was published at Versailles, April 21, 1764, and printed in New Orleans in October, 1764.

The nature and extent of the Treaty of Fontainebleau is made plain by the decision of the Supreme Court of the United States in the case of United States v. D'Auterive, 10 How. 609, 13 L. Ed. 560, from which I quote the following:

"On the 3d day of November, 1762, by a treaty, or, as it is termed in the language of the king, by 'a special act,' done at Fontainebleau, Louis XV ceded to the King of Spain the entire province of Louisiana, including the island and city of New Orleans. The character and extent of this act of cession, as evinced by the instructions from the French king, dated at Versailles, April 21, 1764, should be noted in this place, as they are decisive of the relative positions of the parties to that act, and of the extent of their powers posterior thereto, over the territories or persons comprised within its provisions. Nothing surely can be more comprehensive or absolute than the transfer announced by the King of France, or the declaration of his relinquishment of all power or rights in the subject transferred. The language of the French king to D'Abadie, director general and commandant of Louisiana, is as follows: 'Having ceded to my very dear and best beloved cousin, the King of Spain, and to his successors, in full property, purely and simply and without exceptions, the whole country known by the name of Louisiana;' he proceeds to command his director general, that, on the receipt of his instructions, 'whether they come to your hands by the officers of his Catholic majesty, or directly by such French vessels as may be charged with the same, you are to deliver up to the Governor or officer appointed for that purpose by the King of Spain, the said country and colony of Louisiana, and the posts thereon depending, *likewise the city and island of New Orleans, in such state and condition as they shall be found to be in on the day of the said cession;* being willing in all time to come that they shall belong to his Catholic majesty, to be governed and administered by his Governors and officers, and be possessed by him in full property, and without exceptions." (Italics ours.)

Notwithstanding the absoluteness in terms of said treaty, and the absence of any provisions for the protection of the titles to the land of the inhabitants, I am of the opinion that the cession by France to Spain of the "whole country known by the name of Louisiana" cannot be understood as a cession of the private property of the French inhabitants to the Spanish government.

On the transfer of the sovereignty of a country, the inhabitants are protected in the possession of their private property. Such is the law of the nations, even in case of conquest. Kenton v. Leonarda, 1 Rob. 343, 350.

In United States v. Percheman, 7 Pet. 51, 8 L. Ed. 604, Mr. Chief Justice Marshall, as the organ of the court, said:

"It may not be unworthy of remark, that it is )very unusual, even in cases of conquest, for the conqueror to do more than to displace the sovereign and assume dominion over the country. The modern usage of nations, which has become law, would be violated; that sense of justice and of right which is acknowledged and felt by the whole civilized world would be outraged, if private property should be generally confiscated, and private rights annulled. The people change their allegiance; their relation to their ancient sovereign is dissolved; but their relations to each other, and their rights of property, remain undisturbed. If this be the modern rule, even in cases of conquest, who can doubt its application to the case of an amicable cession of territory? Had Florida changed its sovereign by an act containing no stipulation respecting the property of individuals, the right of property in all those who became subjects or citizens of the new government would have been unaffected by the change; it would have remained the same as under the ancient sovereign."

These decisions are equally applicable, in so far as its effect upon private property is concerned, to the cession made by France to Spain of the territory of Louisiana under the treaty of 1762.

The Supreme Court of the United States, in the case of United States v. Arredondo et al., 6 Pet. 711, 8 L. Ed. 555, say that they will decide "whether the land in controversy was the property of the claimants, before the treaty, and if so, that its protection is as much guaranteed by the laws of a republic, as the ordinances of a monarchy."

In Lavergne's Heirs v. Elkins' Heirs, 17 La. 230, the Supreme Court of this state held that:

"The treaty which ceded Louisiana to the United States expressly guarantees to all the inhabitants equal rights and privileges with other citizens and protects and maintains them in the enjoyment of their property. Article 3 of the treaty of cession, vol. 1, Land Laws, p. 43; Delassus v. United States, 9 Pet. 133, 9 L. Ed. 71."

It is well settled that land severed from the public domain by the French or Spanish authorities and set apart as private property did not pass to the United States under the treaty of Paris on April 30, 1803, which ceded to them "all public and unappropriated lands." United States v. King, 3 How. 773, 11 L. Ed. 824.

It is my opinion, therefore, that the adjudication and sale made to De Pontalba in 1760, under an order of the Supreme or Superior Council of the Province of Louisiana, in the succession of Broutin and wife, had the legal effect of separating this tract of land from the French public domain and setting aside the same as private property.

Spain did not acquire the Broutin tract under the treaty of 1762, for this reason.

In fact, Spain did not obtain possession of Louisiana until 1769, and then only by force of arms.

Baron de Carondelet did not become Governor and intendant of the provinces of Louisiana and West Florida until December 30, 1791.

The so-called grant to Macarty from Baron de Carondelet was made in the year 1795, under Spanish, and not under French, domination.

In order to ascertain the powers of the Supreme or Superior Council of the Province

of Louisiana towards the close of the French régime in 1760 I quote the following from "the Legal Institutions of Louisiana," an article by the Hon. Henry Plauche Dart, appearing in the Louisiana Historical Quarterly, vol. 2, No. 1, p. 102:

"The archives of the Superior Council from its organization under the Edict of 1719 to the Spanish period comprise deeds, mortgages, marriage contracts, wills, inventories, records of trials, civil and criminal opinions and judgments, in brief, here lies the evidence of every judicial act and of other transactions that required consent, approval, or execution by the government. The clerk's notarial records, and those of other notaries, are mingled in the hodgepodge. Besides these there are innumerable documents, papers and data on every imaginable subject."

"The Superior Council was the body of the government and combined in itself the executive, legislative, and judicial departments. The court and its sheriff, the conveyance and mortgage office was a part of the system. It had also the custody of notarial records of deceased, resigned and removed notaries. Its clerk was ex officio notary, a practice that still survives. There appears to have been no system of registry such as we have devised, but the law made the deposit with the council the first evidence of all such transactions throughout the province." Tr. 27592, p. 140.

In the year 1728, the council of state promulgated an edict requiring those who claimed ownership or possession of land in the province of Louisiana under grant from the company of the West to appear before the Superior Council within six months from the registry of the decree in said province and to exhibit before that body their titles or claims for confirmation.

It was provided in said decree that all unoccupied and unimproved lands, or lands for which no title was presented, should be forfeited and should fall within the public domain.

The Supreme or Superior Council was ordered to enforce this ordinance. "Under this system," says Fortier, "a number of early land grants was forfeited, the titles of others were completed, and the custom then established was continued until the beginning of the Spanish domination."

See article, "the Legal Institutions of Louisiana," cited supra, pp. 96, 97; Fortier's History of Louisiana, vol. 11, p. 35; Gayarrie's History of Louisiana, vol. 1, p. 391.

In enumerating the powers of the Supreme or Superior Council Fortier states that:

"It acted as a tribunal and administered the affairs of the colony according to the laws, edicts and ordinances of France and the customs of Paris. * * * It was this council that in 1722 directed the removal of the seat of government to New Orleans, and the next year began the exercise of police power. In 1724 it enacted the Black Code. However, it was given a supervisory authority over land titles by the king, who also at the same time authorized it to remove and appoint at will an inferior court of its own members. By 1748 it acquired a discretionary authority over land titles, and in 1763 issued the decree dispossessing the Jesuits of their plantations." Fortier's History of Louisiana, vol. 2, p. 518.

It is clear, therefore, that the Supreme or Superior Council was the head of the land department of the French government in the province of Louisiana from the year 1728 until the beginning of the Spanish domination in 1769.

The adjudication of the Broutin plantation to De Pontalba April 17, 1760, was not made by the order of an inferior court.

As recited in the procès verbal of said adjudication, the sale to De Pontalba of this property was effected "by virtue of an order of the Supreme Council of the Province of Louisiana, under date of the 9th of February last, rendered at the request of Mr. Delfant de Pontalba, De La Ronde, and Ignace Brontin, coheirs in the Succession of the deceased Mr. and Mrs. Broutin, Plaintiffs, versus Mr. Marigny De Mandeville, also coheir, in the said Succession, Defendant, the said order decreeing, according to the opinions of the King's Attorney General, that the immovables unsold belonging to said succession, should be immediately sold to the highest and last bidder, etc."

The adjudication was made by "Charles Marie Delalande Dapremont, councilor judge of said council, commissioner nominated to that effect, accompanied by Mr. Jean Baptiste Raquet, councilor of said council, acting as the King's Attorney General," after having transported themselves "to the bar of the court with the clerk and usher of said council, for the purpose of receiving the first outcry and bid for a parcel of land and plantation belonging to said succession."

The property adjudicated to De Pontalba as the last and highest bidder is described in the procès verbal of adjudication as "a piece of land and plantation belonging to the succession of the deceased Mr. and Mrs. Broutin, situated at about one league above and on the same side of this city, going up the river. adjoining on one side the plantation of the succession of Mr. Delino, deceased, and on the other that of Mr. Carminada, having eleven and a half arpents front by the whole depth which might be found, and following the point of the compass, the said land ending in a point in its said depth, like the other land adjoining it in that part; with all the quantity of ten and one-half arpents of land front, to be taken from the limits of the forty arpents depth of the land of the said Mr. Delino, deceased, by the whole depth which might be found there; and following the point of the compass it has to run, this portion of the ground belonging likewise to the succession of the said Mr. Broutin, deceased, who reserved it to himself at the time he sold the ten and a half arpents between parallel lines from the front part to said Mr. Delino, deceased, by forty arpents in depth only, as appears by the titles which will be delivered to the highest bidder as the whole stands, appurtenances and dependencies, without reserve."

It is declared in the procès verbal of said adjudication that "the said King's Attorney General, we, councilor, judge, commissioner aforesaid, and undersigned, have adjudged, and do hereby definitively, purely, and plainly adjudge the said land, plantation, appurtenances, and dependencies, as the whole now stands, to the said De Pontalba, as the highest and last bidder."

This adjudication was made for the price of "thirty-nine thousand seven hundred pounds," and was signed by Delalande and Raquet in their respective capacities, as councilors, judge, commissioner, and King's Attorney General, and by Pontalba and De La Ronde.

As we have seen, this sale was effected under the order of the Supreme or Superior Council, over which presided all of the officers of the king duly commissioned by him as councilors. The Supreme or Superior Council was the highest tribunal of the King of France in the province of Louisiana, and was vested with general and original jurisdiction in civil and criminal matters.

While the trial of certain civil and criminal cases, in order to expedite the public business, was committed to ordinary jurisdiction, with members of the Supreme Council presiding, we have been unable to find any edict which has placed under such jurisdiction the sale of succession property, or other probate matters.

See article, "The Legal Institutions of Louisiana," pp. 95, 96, published also in Southern Law Quarterly, Nov. 1918.

As expressly stated in the procès verbal, the councilors making this adjudication had been nominated by the Supreme or Superior Council for the purpose of executing the order of that body. In other words, the Supreme or Superior Council enforced its decree in the Pontalba Case through two of its own members. The property adjudicated is expressly declared to be the private property of the deceased, Broutin and wife, is recognized and sold as such, with minute description, and according to "titles which will be delivered to the highest bidder." Unquestionably, these titles had been examined by

the Supreme or Superior Council of the Province of Louisiana, and the property sold in the succession of Broutin and wife had been fully recognized as the private property of decedents before the order was granted by the Council for the sale in the succession proceedings.

All grants and deeds to land were required to be registered with the Supreme or Superior Council, as the governing body, and as the head of the land department of the French government in the colony of Louisiana.

It is plain, therefore, under this state of facts, that the adjudication made to De Pontalba of the Broutin tract or plantation in 1760 was an act of the French government through its Supreme or Superior Council, acknowledging the private ownership of this property as vested in the succession of Broutin and wife, approving the titles to same, and thereby relinquishing any claim that the King of France as sovereign might have to the land in question as a part of the public domain.

Manifestly, the effect of this adjudication was to sever from the lands of the crown, and to set aside as separate property, the Broutin tract adjudicated to De Pontalba in 1760 under the French régime.

While the De Pontalba adjudication was not a governmental act of formal grant or concession, executed and delivered under seal, yet, necessarily, such adjudication must be construed, either as a confirmation of the original grant, or at least as a relinquishment of any right or title of the sovereign in or to the property adjudicated, and must be accepted as an acknowledgment on the part of the French government that the property disposed of was private property, in the possession and occupancy of the decedents and their heirs, and therefore actually severed from the public domain of the province of Louisiana at the date of said adjudication.

It follows, therefore, that the Broutin tract or plantation, adjudicated to De Pontalba in 1760, formed no part of the public and unappropriated territory of the Province of Louisiana, acquired by Spain in 1862, or by the United States under the Treaty of Paris in 1803.

The grant or exchange, if it may be so termed, made by the Baron de Carondelet in 1795 to Macarty, of any part of the Broutin tract, subsequently acquired by Livaudais, and thereafter by John McDonogh, was therefore null and void.

The decision in the Union Lumber Company Case, above cited, holding that the Carondelet concession to Macarty is "an exchange of property made with the French (Spanish) government," is clearly contrary to the former decisions of this court as to the nature of the alleged Macarty grant.

In Fleitas v. Mayor and Aldermen of New Orleans, 1 Mart. (N. S.) 430, it was held that the grant claimed by Macarty was not, in any proper sense, a complete grant, but a mere order for a survey.

This conclusion was reached by the court, after a most careful and thorough review of the deposition of Vicento Sebastian Pintado, formerly deputy surveyor general of the province of Louisiana.

The decision in the Fleitas Case was rendered in July, 1823, and was affirmed in Pontalba v. Copland, 3 La. Ann. 86.

Again, the claims of Pontalba were adjudged to be superior to those of Macarty in Moore et al. v. Pontalba, 13 La. 571.

In the decision of the board of commissioners for the Eastern district of the Territory of Orleans, communicated to the House of Representatives January 9, 1812, as to claim 194 of Jean Baptiste Macarty, it is said:

"Jean Baptiste Macarty claims a tract of land, situate back of the city of New Orleans, and adjoining the Canal Carondelet, containing about 1,300 acres. The claimant pretends that this land was surveyed for him, by virtue of an order of the Baron de Carondelet, dated 1795,

and that the papers relating to his title have since been destroyed by fire. In support of this, he exhibits a certificate of Pintado, who states that the survey was executed by him, by order of Carondelet. Admitting it as a fact that the land was surveyed for him by order of Baron de Carondelet, it must have been upon condition that the land was vacant; but it appears clearly that the whole of this land was covered by grants antecedent to the period that the land is stated to have been surveyed by the claimant; we therefore reject the claim." Tr. No. 19439, p. 274.

We must decline, therefore, to accept the holding in the Union Lumber Company Case that the Macarty claim, though not a grant, was "an exchange of land with the French (Spanish) government," for the simple reason that the Spanish king was powerless to cede to Macarty, by grant or exchange, the private property of a French subject, acquired by him prior to the cession of the Louisiana territory to Spain by the King of France.

"The king cedes that only which belonged to him," as is said in the Percheman Case.

I find no conflict in the conclusion reached by me with the decision of the Supreme Court of the United States in the case of United States v. Ducros, 15 How. 38, 14 L. Ed. 591, in which it is said:

"The proceedings before Carondelet in 1793, in the settlement of the estate of Louis Toutant Beauregard, could not be construed as a confirmation of the French grant, *from the mere circumstance that in the inventory, decedent's estate is described as running back to the Lake.* Carondelet could not be said to confirm, in his political capacity, *a title which is not even stated in the mere formal proceedings before him in his judicial capacity.*" (Italics mine.)

The case at bar and the Ducros Case are entirely different. The procès verbal of the adjudication admits that the land adjudicated to De Pontalba by the Supreme Council of the Province of Louisiana belonged to the succession of Broutin and wife, specifically describes the property adjudicated, and tenders the titles to same to the adjudicatee.

The chief officers of the French king, the Governor, the two Lieutenant Governors, the Attorney General, etc., were members of the Supreme or Superior Council, which was the body of the colonial government, the head of its Land Department, and the official custodian of all grants, deeds, etc. Gayarre's Hist. of La. vol. 1, pp. 251, 252.

I cannot agree, therefore, with the holding in the Union Lumber Co. Case that the adjudication to De Pontalba in 1760 by the Supreme Council was nothing more than the mere decree of an ordinary court of probate jurisdiction. In my opinion, this adjudication went much further in legal effect, and operated either as a confirmation of the original grant under which the Broutins held this property, or, at least, as a relinquishment by the French king of any claim to same as a part of the crown lands of the Province of Louisiana.

Thus far it has been seen that Macarty derived no title from the so-called Carondelet grant in 1795, as to any portion of the Broutin, Livaudais, or McDonogh tract.

2. The Macarty claim was confirmed by Congress in 1823, only "against any claim on the part of the United States." Act of Congress, Feb. 28, 1823, c. 15 (U. S. Stats. at Large, vol. 3, p. 727); Tr. No. 19439, p. 249.

The Livaudais claim was confirmed at the same time and by the same act to the depth of 80 arpents.

The McDonogh claim was confirmed by Congress in 1858 as to all of the land in the Broutin-Livaudais tract, back of the 80 arpents line and running thence to the apex of the triangle including said tract. The act of Congress ordered no patents issued either to the Macarty claimants, or to Livaudais, in 1823. A patent was ordered to issue in 1858 "as in ordinary cases to the legal representatives of John McDonogh; provided that this confirmation may be construed as a relin-

quishment of all rights and title of the United States, and shall not prejudice the legal claim of any other party, should such exist." Act of Congress, June 7, 1858, c. 119 (U. S. Stats. at Large, vol. 11, p. 545); Tr. No. 19439, p. 247.

It is clear from the language of the acts of Congress confirming the Livaudais, Macarty, and McDonogh claims that the United States government created no new titles in the confirmees, but merely quitclaimed as to them any title that the United States might have to these lands. Macarty and his heirs and assigns had no legal title to this property, either in 1795, 1823, or in 1858, under any grant from or exchange with the Spanish government.

The act of Congress in 1823 did not, by any means, pretend to confirm the so-called Carondelet-Macarty concession made in 1795.

The United States had no right to, or title in, this property, either in 1823 or in 1858, for the simple reason that the French government had recognized the Broutin tract as private property, and as severed from the public domain in 1760, when the adjudication was made to De Pontalba in the succession of Broutin by the Supreme Council of the Province of Louisiana. The Broutin tract did not pass, therefore, to the United States as a part of the public and unappropriated lands of the French government under the Treaty of Paris.

Land titles, protected by treaties made by the United States with foreign powers, are beyond the jurisdiction and control of Congress, as such treaties constitute a part of "the supreme law of the land," under article 6 of the federal Constitution. For this reason, the act of Congress confirming in 1823 the Macarty claim did not affect either the priority or the validity of the McDonogh claim, which in itself, is a complete legal title protected by the Treaty of Paris, under which France ceded to the United States in the year 1803 the Territory of Louisiana. It was not within the power of Congress by enactment either to add to or to take from the McDonogh title, or to divest it of its quality as an antecedent grant.

3. Nor has plaintiff in this case acquired squares 490 and 491 by the prescription of ten years' acquirendi causa.

"The plaintiff in an action of revendication must make out his title, otherwise the possessor, whoever he be, shall be discharged from the demand." Code of Practice, art. 44.

Plaintiff alleges in his petition that the city of New Orleans is in the physical possession of the property in dispute in bad faith, and claims ownership thereof, without any legal right or title thereto.

The evidence shows: That in the year 1908 the city of New Orleans caused a wire fence to be built around squares 490 and 491, the title to which is in controversy in this case, and also posted signs on the property offering the same for sale.

That since the year 1908, the New Orleans park commission has used these squares for a city nursery, under the authority of the city government. The evidence further shows that under a permit issued in 1879 by Mayor Behan, Essex Johnson took possession of square 490, built a house upon this square, and cultivated thereon a truck garden during that year, and that Johnson, as a licensee of the city of New Orleans, has been continuously in the possession of this square since that date. Squares 490 and 491, in controversy in this suit, were inclosed by a common fence, without a dividing line. It is clear, therefore, that plaintiff had not been in the actual possession of the property in question during a period of ten years, under title translative of property, prior to the filing of the present suit.

4. At the date of the institution of this suit, December 31, 1925, the city of New Orleans and its authors in title, John Mc-

Donogh, had held this property under titles running back 165 years to the original Pontalba adjudication in 1760.

The plantation belonging to the succession of Broutin and wife measured 127⅓ arpents in depth from the Mississippi river, when the side lines of this triangular tract were projected to a closing point or apex, as required by the title of Broutin, and as set out in the adjudication to De Pontalba in 1760. This is conceded in the report of Canonge and Carter, register and receiver of the United States Land Office, made in 1837 on claim No. 39 of McDonogh, which was confirmed in 1858 by Congress. Tr. No. 19439, pp. 242, 247.

It is stated in this report also that Jacques Francois Enoul Livaudais in the year 1821 had claimed, before the register and receiver, for the tract owned by him, a depth of 80 arpents, which was confirmed by Congress in 1823, as Livaudais did not have at the time he entered his claim the original papers proving that the land extended in the rear until one line crossed or intersected the other in a point, as all adjoining tracts do— a fact stated in the Broutin title in the adjudication to De Pontalba in 1760. Tr. No. 19439, pp. 242, 247.

It is declared in all of the acts of sale of the Broutin tract or plantation from 1760 to 1768, i. e., in those made from the succession of De Pontalba to Dargeton, from Dargeton to Jacquelin, from Jacquelin to Le Marquis, and from Le Marquis to Chantalon, that the tract of 11½ arpents front is conveyed "by the depth and point of compass it runs to," and that "the overplus of said angle forms consequently the superficies of the land actually sold," i. e., after the deduction from the triangular tract of the 10½ arpents front, with 40 arpents depth, sold to Delino de Chalmette by Broutin in 1851.

It is true that the original Broutin tract is described in these acts of sale as "having 22 arpents front by 80 in depth."

Whether the area conveyed by these deeds contained more than 80 arpents in depth is a matter not now before this court, and I express no opinion on that question, as we are concerned here only with the titles to property lying within the 80 arpents line.

It must be conceded, however, that from 1760 to 1818 all of the acts of sale were made with full warranty, and with an estimated depth of 80 arpents, which the Broutin-Livaudais-McDonogh tract unquestionably contains.

In 1826 Jacques Francois Enoul Livaudais transferred to his wife, then separated from him in bed and board, his plantation measuring "sixteen arpents thirteen toises, and more if it is to be found, fronting the river (Mississippi), of which nine upper arpents have a depth of eighty arpents, and the surplus shows a depth of forty arpents."

This sale, as to the property above described, was made "under all guaranties of right." It is also declared in said act that:

"The said seller sells, together with the said plantation, and without reserve, all buildings of whatever kind now on said plantation, and in their present state; also all the rights which may have been recognized as belonging thereto according to said seller's titles, and beyond all of the depths already established, without any guaranty on his part for these same eventual rights, which he declares to have never alienated."

As to what the "eventual rights" of Livaudais beyond the 80 arpents line might be is wholly immaterial in this case, as it is apparent that the title transferred to Mrs. Livaudais by him is with full warranty up to the 80 arpents line, which not only extends from the front of the property to that depth, in the upper 9 arpents, but also to a depth of 40 arpents, from the 40 arpents line in the rear of the lower 7 arpents.

All of the titles of Jacques Francois Enoul Livaudais referred to in the act of sale to his wife call for three different tracts of land acquired by him, to wit: Tract No. 1, con-

taining "about three arpents eighteen toises front on the river, by a depth of 80 arpents, purchased by him from Jacques Philipe Enoul Dugue Livaudais, Francois Joseph Enoul Dugue Livaudais, Charles Enoul Dugue Livaudais, and Louis Harang and wife, Mrs. Jeanna Maria Genevieve Enoul Dugue Livaudais, who purchased this property at a sale in the succession of Jacques Enoul Livaudais June 11, 1817.

Tract No. 2, described as "a tract of land containing ten arpents in front upon 80 arpents in depth, attaining on one side to land owned by Madame widow Parris (Panis), and on the other side by another owned by the aforesaid Santiago Enoul Livaudais," the father of Jacques Francois Enoul Livaudais.

This land is described in the marriage contract of Jacques Francois Enoul Livaudais with Maria Celeste de Marigny Mandeville, made November 20, 1797.

The marriage contract was signed before a notary and two witnesses by the contracting parties and by the parents of both.

The property therein described was "an advance of inheritance," or donation inter vivos, made to Jacques Francois Enoul Livaudais by his father, Santiago Enoul Livaudais, at the time of his son's marriage, as recited in the act of sale made by Livaudais to his wife in 1826.

Tract No. 3, purchased December 13, 1803, by Jacques Francois Enoul Livaudais from Jacques Philipe Enoul Livaudais, is described as "two arpents of ground front, situated on the side of the Tchoupitoulas (road), now in this city, by eighty arpents deep, adjoining on one side the land of the vendor, and on the other the land of the purchaser, the same which belongs to me, having acquired it from Mr. Chantalon the third of March seventeen and sixty nine." Chantalon, acquired from Pierre Marquis, September 9, 1768, all of the Broutin tract adjudicated to De Pontalba in 1760, and described in the Chantalon deed as "having eleven arpents and two in front by the depth and point of compass it may have, which said plantation heretofore formed a right angle of which the basis fronting the river had twenty-two arpents front by eighty arpents in depth, but the late Mr. Broutin, to whom it belonged, having sold ten arpents and a half front by forty arpents only in depth to said Sr. Delino, and in two parallel lines, the overplus of said angle makes the surplus of the ground which the said sellers sell actually."

There is a break in the chain of title from Chantalon, "but," as is said in the opinion of the Court of Appeal in the Quaker Realty Company Case, 10 Orleans Reports, 84, "it is admitted that an original act of sale by Chantalon to Santiago Livaudais (father of Jacques Francois Enoul Livaudais) before Garic on March 3rd, 1769, is not among his archives."

As the record in the Quaker Realty Company Case is a part of the record in the present suit, I note the admission made in connection with the case at bar.

The title of Jacques Francois Enoul Livaudais is based therefore upon ancient titles and possession running back to the Pontalba adjudication in 1760.

The Livaudais plantation, acquired through regular chain of title, clearly contained at least a depth of 80 arpents.

Pierce, Morgan, Peters, and Chase purchased this property on February 24, 1832, from Madame Maria Celeste de Marigny Mandeville, the wife, separated in bed and board, of Jacques Francois Enoul Livaudais, she having acquired same from her husband in part payment of her dotal claims. The said tract of land or plantation was sold by Madame Livaudais to Pierce et al. as "measuring sixteen arpents twenty toises, more or less, front on the river Mississippi, with all the depth thereto belonging, by virtue of the titles of the property hereafter enumerated, and with the width they may have in the rear in virtue of said titles. The said tract

of land or plantation is bounded on the upper limit by the property of Mr. Lassize, and on the lower limit partly by the property of Robert Layton, now used as a rope walk; together with its dependencies, etc., without any exceptions, the whole well known of the purchasers who have at leisure visited the premises, and want no other designation thereof."

It is further stated in said act of sale that:

"In order to enable the aforesaid purchasers to examine and study the history of the titles of property depending from and belonging to the said tract of land, the said vendors acting as aforesaid (the agents of Mrs. Livaudais), have presently delivered the copies of all the deeds and transactions relative to said tract of land or plantation, from the twenty-third day of February, one thousand eight hundred and twenty-six, at which time Mr. Livaudais sold, per act before Lafitte, the said tract of land to his wife, the said Mrs. Livaudais, down to the twenty-second day of April, one thousand seven hundred and fifty-one, at which time Mr. and Mrs. Broutin sold to Delino de Chalmette a certain tract of land of larger extension, a portion whereof is the tract of land presently sold, the receipt of which copies the said purchasers do hereby acknowledge."

The above declarations in the act of sale to Pierce et al., not only show that the purchasers were personally and well acquainted with the premises purchased, but, in addition to this, they had presented to them copies of the various acts of sale, not only from the date of the adjudication of this property to De Pontalba by the Supreme Council of the Province of Louisiana in the year 1760, but as far back as the year 1751, when Mr. and Mrs. Broutin sold a part of this property to Delino de Chalmette.

There can be no question as to the knowledge of Pierce et al., the purchasers, as to the extent of this property, nor as to the fact that such extent was supported by the deeds delivered to them, covering a period of 75 years between the sale to Delino de Chalmette in 1751 and the sale to Mrs. Li-

vaudais in 1826. A regular chain of title is disclosed in the act of sale by Mrs. Livaudais to Pierce et al.

John McDonogh purchased this property from Pierce et al. in 1836. The mere fact that his vendors did not guarantee the title to the land in the rear of the 40-arpent line, or the lower line (or lake side) of St. George (now Howard) street, is unimportant, as the title of Mr. Livaudais to this property is unquestionably good and valid up to the 80 arpents line.

While Pierce, one of the vendors of McDonogh, reserved any right acquired by him to a lot or parcel of ground containing 180 acres purchased from the New Orleans Canal & Banking Company, Samuel Kohn, Laurent Millaudon, and John Slidell, by an act of sale executed before Jules Mossy, notary public, bearing date June 4, 1833, it is stated in said reservation:

"But he does not reserve any right which he has acquired from the said Mrs. Livaudais by the aforementioned act before Louis T. Claire, notary, on the said twenty-fourth day of February, eighteen hundred and thirty-two, each party thereby standing upon the merits of their respective titles, as if the said Levi Pierce was no party to this act."

In other words, Pierce warranted the title to John McDonogh as far as "any right which he has acquired from Mistress Livaudais," but not otherwise.

In my opinion, the title of Mrs. Livaudais, having been acquired from her husband, the true and lawful owner of this property, is good and valid, as he held under a regular chain of title from De Pontalba and the Broutins, and the reservation of Pierce, otherwise, is immaterial, as his authors in title claim under the Macarty grant.

The Court of Appeal for the parish of Orleans, in the case of Quaker Realty Co., 10 Orleans Reports, 79, has reviewed the McDonogh claim and the Macarty-Carondelet grant in a most thorough and able man-

ner, and has upheld the McDonogh claim as founded upon a valid and complete grant, and as a title complete by itself and requiring no act of confirmation by the United States.

In that decision the 80 arpents line was declared to begin near Hagan avenue in the Broutin or Livaudais tract, and squares 495, 501, 502 and 503 in said tract were declared to be located within said line and to be the property of the city of New Orleans. These squares lie adjacent to squares 490 and 491, involved in this suit.

This court, through Mr. Justice Sommerville, the organ of the court, in City of New Orleans v. Union Lumber Co., 145 La. 476, 82 So. 588, refused, on April 13, 1914, an application for a writ of review of the Quaker Realty Company Case, under No. 20568 of the docket of this court.

In the case of John McDonogh v. United States (No. 42) on the docket of the United States District Court, Eastern District of Louisiana, sitting in chancery, in which McDonogh sought to have the validity of his title inquired into and decided, the opinion of the court, in part, is as follows:

"It is true, as contended by the district attorney, that the claim of the petitioner in this case is not founded upon a formal grant, warrant, or order of survey made by the civil government at the date alleged. But the French colonial government, through its authorized officer acting in a judicial capacity, in ordering the sale of the land in question, for the purpose of settling the affairs of the succession of Broutin, who had possessed the land as owner until the period of his death, recognized the title of Broutin, and thus divested the government of all right to claim it. A grant may be made as well by a direct recognition of title as by a formal investiture of title in terms. It is entirely immaterial whether the right of Broutin was derived originally from possession, or by a delivery of title, in the words usually employed, if the petitioner can show a clear recognition of his title by the lawful authority of the sovereign exercising dominion over the country. The acts of the sovereign are binding upon his successors, and both the laws of nations and the stipula-

tions of the treaty of 1803, protect the petitioner in the enjoyment of the land, which he holds by a regular chain of title from the original owner. I am, therefore, of the opinion that this claim must be confirmed under the provisions of the act of 1824, revived by that of 1844." Tr. No. 19439, United States v. McDonogh, pp. 127, 128.

An appeal was taken from this decision, and the Supreme Court of the United States, in passing upon the case in United States v. Roselius, 15 How. 36, 14 L. Ed. 590, said in part:

"Now, the title set up by the petitioner is a complete legal title; and if he can establish the facts stated in his petition, his title is protected by the treaty itself and does not need the aid of an act of Congress, to perfect or complete it. For undoubtedly, if the possession of the land has been held continuously by the petitioner and those under whom he claims under the judicial sale made by the French authorities in 1760, the legal presumption would be that a valid and perfect grant had been made by the proper authority, although no record of it can be found."

The case was reversed on appeal solely for want of jurisdiction in the lower court.

McDonogh filed his petition in the United States District Court for the Eastern District of Louisiana in May, 1846. He set out in that petition his title from Morgan, Pierce, Peters, and Chase by notarial act of sale passed on or about February 10, 1836, and the different mesne conveyances of said property traced back to the adjudication to Pontalba in 1760 of the Broutin plantation by the Supreme Council of the Province of Louisiana, alleging that said sale and adjudication, by the order and authority of said council, was fully equivalent to a patent to said land. He alleged also the continuous possession by his authors in title and by himself of this property. Tr. No. 19439, United States v. McDonogh, pp. 3, 4, and 5.

The act of adjudication to De Pontalba in 1760 describes the property sold specifically and as "a parcel of land and plantation belonging to the succession of Mr. and Mrs. Broutin, deceased," and "definitively, purely,

plainly adjudged the said land, plantation, buildings, appurtenances, and dependencies, as the whole now stands, to the said Mr. De Pontalba, as the highest and last bidder."

Both possession and cultivation by the Broutins in 1760 are conceded by the adjudication itself. The Broutin plantation is conveyed in each of the subsequent acts of sale to Dargeton, Jacquelin, Le Marquis, and Chantalon, with its main house, kitchen, store, dryhouse, negro cabins, yard, garden, and, in some instances, with crops hanging by the roots, slaves, stock, etc., as per inventory. Possession by Livaudais and his wife is fully shown by deed of Mrs. Livaudais to Morgan, Pierce, Peters, and Chase in 1832, and in deed from these purchasers to John McDonogh in 1836.

In the opinion or report of Cannonge, register, and Carter, receiver, of the United States Land Office at New Orleans, of date November 22, 1837, in referring to the McDonogh claim, No. 39, and other claims therein mentioned, it is stated that:

"A careful and particular examination of these claims proves satisfactorily to our minds that they are all based upon good titles, French and Spanish grants, ancient possession, and continuous cultivation, according to the requisites of the law." Tr. No. 19439, pp. 242, 247.

It is also stated by the register and the receiver, in the opinion or report made by them on the McDonogh claim, based on the Pontalba adjudication, that:

"This document is the most perfect government title that could be issued; it is fully equivalent to a patent." Tr. No. 19439, pp. 242, 247.

In an extract from American State Papers, containing the report of S. H. Harper, register of the land office for the Eastern district of Louisiana, approving the claim of J. F. E. Livaudais, the following declarations are made:

"No. 74. Jacques Francois Enoul Livaudais claims a tract of land situate in the parish and county of Orleans, on the left bank of the Mis-

sissippi, near the city of New Orleans, containing 19¾ arpents front and 80 arpents in depth."

"This land is held partly in right of inheritance and partly in right of purchase; the whole founded on an original French Concession. I am therefore of the opinion that the claim ought to be confirmed." Volume 3, of American State Papers, Public Lands, Gale and Seaton's Edition, p. 584; Duff Green Ed. p. 512; Tr. No. 19439, pp. 248, 250.

In report No. 358, 35th Congress, 1st Session, from the committee on private land claims, House of Representatives, after stating that no action was ever taken by Congress on the favorable report made on the McDonogh claim by the register and receiver of the land office at New Orleans in 1837, and after reviewing the history of the litigation by McDonogh in the federal courts as to his claim, it is said:

"In this anomalous condition, thrown out of court because his title was found not to be imperfect; with no power to which an appeal can be taken except to the legislative department of the government, the representatives of McDonogh ask that Congress will, without delay, confirm their claim to the said tract of land, which has been held in undisputed possession, occupancy and cultivation, since before 1760. And as your committee can suggest no reason why it should not be done, herewith report a bill and ask its adoption." Tr. No. 19439, pp. 264, 265.

The present record is replete with proof that the Broutin tract, adjudicated to De Pontalba in 1760, had been held in possession continually by McDonogh and those under whom he claimed, at the date of his suit in the United States District Court for the Eastern District of Louisiana.

The facts stated in the petition filed by McDonogh in the federal court in the year 1846 have been established in this case, and I adhere to the opinion of the Supreme Court of the United States, that McDonogh has "a complete legal title," which "is protected by the treaty itself, and does not need the aid of an act of Congress to perfect or com-

plete it." United States v. Roselius, 15 How. 36. 14 L. Ed. 590.

John McDonogh died in the year 1850. His will was duly probated, and the cities of New Orleans and Baltimore were recognized as universal legatees, and sent into possession by decree of court. Tr. 19439, pp. 76, 77.

Even if the Carondelet grant to McCarty should stand the test, as a Spanish concession, as. to form, and even if the act of Congress should be construed as confirming this grant. the McDonogh claim needs no such confirmation, and, being prior in date to the Macarty grant, must prevail over it, as far as any encroachment by the Macarty grant as to the land within the 80 arpents line is concerned.

For these reasons, I am of the opinion that the decision of this court in City of New Orleans v. Union Lumber Co., 145 La. 476, 82 So. 588, is erroneous, both as to the holdings that the so-called Macarty grant is an exchange of lands with the French (Spanish) government, and that the priority of confirmation of the Macarty claim by Congress gave priority of title to the claimants holding under the same, and also as to the holding, if it may be so construed, that Broad street is the 80 arpents line of the Livaudais or McDonogh tract. The line was properly fixed as beginning near Hagan avenue in the Quaker Realty Company Case, above cited, and is correctly located as appears on the map in the record, designated as "Descriptive Sketch, after the Survey Made by Davey & Waddill, Dated Nov. 23, 1907." See testimony of Waddill, Tr. 27592, pp. 73, 74, 82; Tr. 19439, pp. 91, 92, 154, 156; testimony of Warren, Tr. 19439, pp. 104, 106.

As the McDonogh claim calls for a depth of at least 80 arpents, it becomes a mere matter of measurement, or surveying, in order to fix the location of this line. Much confusion has arisen, not only in the decision in the Union Lumber Company Case, but in the testimony of the witnesses, as to the location of the 80 arpents line. This has resulted from confounding the property line of the McCarty grant, which intersects and conflicts with the McDonogh grant at Broad street, with the 80 arpents line in depth of the latter grant.

5. Under my view of the case, I do not find it necessary to pass upon the pleas of prescription tendered by the defendant, the city of New Orleans, whose title to this property is good and valid, under the will of the late John McDonogh. The alleged bad faith of defendant in taking possession of these squares of ground is therefore a matter eliminated from discussion and consideration.

6. The additional title asserted by plaintiff in the alternative is under a state auditor's deed.

Plaintiff contends that the state had acquired squares 490 and 491 in 1885 for nonpayment of state taxes assessed in the name of John Irwin in 1882 and 1883. On January 25, 1895, the state sold said squares to Edwin Irwin, the author in title of plaintiff.

The will of McDonogh conveyed the title or ownership of the property embraced by the legacies to the universal legatees, the cities of New Orleans and Baltimore, for the purpose and support of public education, in the proportion of ·one-half to each. State v. Executors of McDonogh, 8 La. Ann. 171.

The property in question is, therefore, public property, and, as such, exempt from assessment and taxation. Const. 1879, art. 207; Martin v. Louisiana Central Lumber Co,. 150 La. 181, 182, 90 So. 553.

It follows, therefore, that the adjudication of these squares to the state in 1885 for nonpayment of state taxes was illegal, null, and void.

Edwin Irwin therefore did not acquire title to squares 490 and 491 under auditor's deed evidencing the sale made to him by the

state in 1895, and conveyed no title to those holding under him, including plaintiff.

7. The plea of estoppel urged by plaintiff, to the effect that the defendant, the city of New Orleans, has recognized his title, and is estopped from denying same, because its officers have assessed and collected taxes on the property in dispute in the name of some of the authors of plaintiff in title, is not well founded.

The collection of any and all taxes, licenses, claims, or debts due to the political corporations of the state is to be made "within such time and in the manner provided by existing state laws, or in the manner that may hereinafter be provided by state laws relative to the collection of taxes due to the state." Act No. 119 of 1882; Const. 1921, art. 10, § 14; Act No. 315 of 1910, § 61.

The city of New Orleans cannot be estopped from claiming its property, by the acts of its officers, because of illegal assessments of such property and the collection of taxes by them under the same. Quaker Realty Co. v. Labasse, 131 La. 996, 60 So. 661, Ann. Cas. 1914A, 1073; Slattery v. Heilperin & Leonard, 110 La. 95, 34 So. 139; Cordill v. Quaker Realty Co., 130 La. 933, 58 So. 819; Martin v. Louisiana Central Lumber Co., 150 La. 181, 182, 90 So. 553.

Judgment was rendered in the court below in favor of the plaintiff, upon the authority of the City of New Orleans v. Union Lumber Co., 145 La. 476, 82 So. 588, the basis of the judgment being that plaintiff had proved his title to the property to be the more ancient and the better title.

As the Union Lumber Company Case should be overruled in so far as the holdings made therein may affect the property claimed by the city of New Orleans within the 80 arpents line, the judgment of the trial court should be set aside, and judgment should be rendered in favor of the city of New Orleans recognizing its title to the property herein claimed as legal and valid.

For these reasons, I respectfully dissent from the opinion of the majority of the court.